**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **MAGĒMĀ TECHNOLOGY LLC,** | |
| **Plaintiff,** | |
| **v.** | **Case No.  04:20-cv-02444** |
| **PHILLIPS 66, PHILLIPS 66 COMPANY, AND WRB REFINING LP,** | |
| **Defendants.** | |

**<u>MAGĒMĀ'S RULE 59 MOTION FOR NEW TRIAL</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

LISTING OF EXHIBITS ........................................................................................................... iv

I.            LEGAL STANDARD ....................................................................................... 4

II.           ARGUMENT .................................................................................................. 6

        A.     A New Trial is Warranted As a Result of Phillips' Repeated Contradiction of the Court's Claim Construction Order................................................................ 6

        B.     A New Trial is Warranted Because Phillips Argued Additional Requirements that Are Not Found in the Claims or Court's Constructions. ......... 8

        C.     Phillips Violated This Court's Order Excluding Inadmissible Evidence. ........... 12

        D.     Phillips Introduced Legal Error By Improperly Comparing its Refinery Processes to the Rigby Process. ........................................................................ 14

        E.     A New Trial Is Warranted As a Result of Phillips' Trial Tactics When Considered as a Whole........................................................................................ 16

                1.     Phillips Misled the Jury with Its Legally Erroneous Argument that Because There was no NDA in Place, Phillips was Free to use the Patented Technology Without Authorization. ......................................... 16

                2.     Phillips Improperly Argued that the Patents Were Not Patentable and Improperly Implied that Phillips Invented the Patented Technology First. .................................................................................. 17

                3.     Phillips' Improper Use of Unlabeled and Misleading Samples with the Jury................................................................................................... 18

                4.     Phillips' Counsel Made Factually Incorrect and Prejudicial Closing Arguments to the Jury. .............................................................. 19

        F.     The Jury's Verdict of No Infringement is Against the Great Weight of the Evidence............................................................................................................. 21

III.          CONCLUSION ............................................................................................. 24

CERTIFICATE OF SERVICE ................................................................................................. 27

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACCO Brands, Inc. v. Micro Security Devices, Inc.*,
  346 F.3d 1075 (Fed. Cir. 2003)..................................................................................15

*Alaniz v. ZamoraQuezada*,
  591 F.3d 761 (5th Cir. 2009) .....................................................................................16

*Catalina Lighting, Inc. v. Lamps Plus, Inc.*,
  295 F.3d 1277 (Fed. Cir. 2002)..................................................................................10

*ContentGuard Holdings, Inc. v. Apple Inc.*,
  701 F. App'x 957 (Fed. Cir. 2017) ...............................................................................7

*Cytologix Corp. v. Ventana Med. Sys.*,
  424 F.3d 1168 (Fed. Cir. 2005).................................................................................7, 8

*Edwards v. Sears, Roebuck & Co.*,
  512 F.2d 276 (5th Cir. 1975) ........................................................................16, 20, 24

*Exergen Corp. v. Wal–Mart Stores, Inc.*,
  575 F.3d 1312 (Fed. Cir. 2009)....................................................................................6

*Fleet Engineers, Inc. v. Mudguard Techs., LLC*,
  761 F. App'x 989 (Fed. Cir. 2019) .............................................................................15

*Hall v. Freese*,
  735 F.2d 956 (5th Cir. 1984) ...............................................................................16, 20

*Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.*,
  772 F.3d 1031 (5th Cir. 2014) ...................................................................................12

*Kotteakos v. United States*,
  328 U.S. 750 (1946)......................................................................................................5

*Liquid Dynamics Corp. v. Vaughan Co.*,
  449 F.3d 1209 (Fed. Cir. 2006).....................................................................................7

*Mills v. Beech Aircraft Corp.*,
  886 F.2d 758 (5th Cir. 1989) .....................................................................................16

*Myco Indus., Inc. v. BlephEx, LLC*,
  955 F.3d 1 (Fed. Cir. 2020)........................................................................................14

ii

*Nissho–Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*,
   848 F.2d 613 (5th Cir. 1988) ...........................................................................20

*Pryor v. Trane Co.*,
   138 F.3d 1024 (5th Cir. 1998) ...........................................................................4

*Riverwood Int'l Corp. v. R.A. Jones & Co., Inc.*,
   324 F.3d 1346 (Fed. Cir. 2003).........................................................................4

*Rousseau v. Teledyne Movible Offshore, Inc.*,
   812 F.2d 971 (5th Cir. 1987) .............................................................................5

*Seidman v. Am. Airlines, Inc.*,
   923 F.2d 1134 (5th Cir. 1991) ...........................................................................5

*Shows v. Jamison Bedding, Inc.*,
   671 F.2d 927 (5th Cir. 1982) .............................................................................5

*Smith v. Transworld Drilling Co.*,
   773 F.2d 610 (5th Cir. 1985) ..........................................................................4, 5

*Streber v. Hunter*,
   221 F.3d 701 (5th Cir. 2000) .............................................................................5

*Whitehead v. Food Max of Mississippi, Inc.*,
   163 F.3d 265 (5th Cir. 1998) ...........................................................................24

*Winter v. Brenner Tank, Inc.*,
   926 F.2d 468 (5th Cir. 1991) ...........................................................................15

*Zenith Lab'ys, Inc. v. Bristol-Myers Squibb Co.*,
   19 F.3d 1418 (Fed. Cir. 1994)......................................................................8, 14

**Statutes**

35 U.S.C. § 295................................................................................................13

**Other Authorities**

FED. R. CIV. P. 50 ..............................................................................................5

FED. R. CIV. P. 59(a)........................................................................................1, 4

FED. R. EVID. 1006 .............................................................................................3

## LISTING OF EXHIBITS

| Exhibit No. | Description | Shorthand |
|---|---|---|
| A | Excerpt of the Day 1 Trial Transcript Before the Honorable Sim Lake, United State District Judge (June 26, 2023) | **Ex. A, Day 1 Tr.** |
| B | Excerpt of the Day 2 Trial Transcript Before the Honorable Sim Lake, United State District Judge (June 27, 2023) | **Ex. B, Day 2 Tr.** |
| C | Excerpt of the Day 3 Trial Transcript Before the Honorable Sim Lake, United State District Judge (June 28, 2023) | **Ex. C, Day 3 Tr.** |
| D | Excerpt of the Day 4 Trial Transcript Before the Honorable Sim Lake, United State District Judge (June 29, 2023) | **Ex. D, Day 4 Tr.** |
| E | Excerpt of the Day 5 Trial Transcript Before the Honorable Sim Lake, United State District Judge (June 30, 2023) | **Ex. E, Day 5 Tr.** |
| F | Excerpt of the Day 6 Trial Transcript Before the Honorable Sim Lake, United State District Judge (July 5, 2023) | **Ex. F, Day 6 Tr.** |
| G | Excerpt of the Day 7 Trial Transcript Before the Honorable Sim Lake, United State District Judge (July 6, 2023) | **Ex. G, Day 7 Tr.** |
| H | Excerpt of Transcript of Docket Call Proceedings Heard Before the Honorable Sim Lake, United State District Judge (March 9, 2023) | **Ex. H, Dkt. Call Tr.** |
| I | Defendants' Closing Demonstrative DDX_043 | **Ex. I, DDX_043** |
| J | Excerpt of Transcript of Hearing on Magēmā's Motion to Compel, Heard Before the Honorable Christina Bryan, United State Magistrate Judge (Nov. 4, 2021) | **Ex. J, Mot. to Compel Tr.** |

At the start of trial, the question of whether the Bayway refinery infringed Claims 1 and 5 of the '884 Patent rested almost entirely on the resolution of a single disputed claim limitation—the flash point prior to hydroprocessing. With the merits overwhelmingly stacked against them, Defendants Phillips 66 and Phillips 66 Company (collectively "Defendants" or "Phillips") deployed a deliberate trial strategy to mislead, confuse, and distract the jury from the actual issue in dispute. Phillips' trial tactics and related prejudicial errors resulted in an unfair trial and a jury verdict against the great weight of the evidence. Pursuant to Federal Rule of Civil Procedure 59(a), Magēmā Technology LLC ("Magēmā") seeks a new trial of Phillips' Bayway refinery infringement of Claims 1 and 5 of the '884 Patent and damages.

Phillips' primary tactic was to manufacture additional claim "requirements" necessary to prove infringement, but which were not based on the actual claim language or the Court's constructions. Phillips' improper additional requirements included: actual testing; a feed compliant "before it hits any of the equipment" (outside the battery limits); and a minimum viscosity. Each of these improper requirements were designed to hinder Magēmā's ability to prove Phillips' infringement at Bayway. While Magēmā's closing and the Court's jury charge properly identified the focus as a comparison between the claim language as construed and the accused products, the prejudicial errors Phillips introduced through its additional requirements were not cured.

Phillips coupled this tactic with other improper tactics that introduced further prejudicial and reversible errors. For example, Phillips' witnesses repeatedly undermined and contradicted this Court's claim construction order. As this Court knows, Phillips disagreed with the Court's construction of "heavy marine fuel oil," which defined the term based on physical properties as opposed to components. Throughout this case, however, Phillips sought to distinguish its refinery processes based on whether the hydroprocessed material is labeled a "residue," "distillate,"

"slurry," or "gas oil." In order to make the distinction that the claim language as construed did not support, Phillips improperly compared its processes to a single commercial embodiment of the patented invention referred to as the Rigby Process. Such comparisons, however, constitute reversible error under well-established Federal Circuit precedent.

Phillips' disregard for this Court's orders did not stop with claim construction. Phillips' brazenly referred to excluded and prejudicial evidence before the jury—without seeking the Court's permission before doing so. Phillips' overt violation of the Court's exclusionary order without reprimand significantly undermined the exclusion, which was ordered because of Phillips' discovery misconduct in the first place. This only further emboldened Phillips' improper trial tactics, resulting in numerous prejudicial errors outlined in the sections that follow this introduction.

Throughout this case and trial, Phillips embraced the theme "begin with the end in mind." Phillips sought to provide Magēmā with only the samples that it wanted Magēmā to have (OSBL feed and product) while simultaneously telling the Court that Magēmā did not need actual samples because estimations were acceptable.  Ex. J, Mot. to Compel Tr. (Nov. 4, 2021) at 11:21-24 ("MR. WALKER: . . . But they're also just formulas based upon what you know about the properties of this fresh feed and of the product, **you can use formulas to calculate and estimate** what the combined properties will be.").  Phillips prevailed in prevented Magēmā from having access to the samples, which were solely within their control. All the while, Phillips knew it intended to argue "actual testing" was necessary to prove infringement. Phillips' own closing slides unabashedly demonstrates that it began with a specific "end" in mind: Magēmā's burden of proof.

Ex. I, DDX_043.

In the same vein, after a long five day Fourth of July break, the jury returned and began its deliberations. Given the amount of time that passed and the complexities of the technology, they reasonably requested copies of the technical experts' presentations. Phillips flatly refused—hoping to impede the jury's ability to carry out its infringement analysis rather than see a just verdict based on the merits of the evidence. Magēmā, of course, objected as at least portions of its technical expert's presentations would be admissible as compilations under FRE 1006.

This was not a simple case. This case presented a lengthy procedural history, a myriad of prior orders and stipulations, nuanced legal concepts unfamiliar to a jury, and complicated technology. This is a case that would have benefitted from *limine* orders to deter prejudicial testimony and arguments—particularly where sidebar conferences were not readily granted to address prejudicial objections outside of the presence of the jury—and to prevent legal error. The need was especially great here because Phillips had demonstrated a disregard for this Court's prior rulings, including its claim construction order and discovery orders, leaving Magēmā in the difficult position of making prejudicial objections before a jury or foregoing critical objections. Phillips exploited the absence of *limine* orders to advance their improper trial tactics. Presumably,

as experienced patent litigators, Phillips' counsel knew that they were repeatedly violating well-established patent law, thereby introducing prejudicial and reversible error. Nonetheless, Phillips' counsel pursued their course, lured by the immediate victory of a jury verdict and ignoring the toll that such improper trial conduct places on the legal system through new trials, appeals, and remands.

Magēmā is a small, veteran-owned, Houston-based company that placed its trust in this Court—not the Eastern District of Texas or the Western District of Texas—to provide it with a fair trial against one of the biggest refiners in the United States. Magēmā recognizes that this Court endeavored to provide a fair trial and rarely grants new trials. But one is warranted here. The totality of the trial proceedings—evaluating the evidence, Phillips' trial tactics, and the ultimate verdict of the jury—demonstrates substantial justice has not been done. When properly focused on the actual claim language as construed, the overwhelming weight of evidence demonstrates that Phillips' Bayway Refinery infringes Claims 1 and 5 of the '884 Patent. Magēmā seeks a new trial on these grounds. This Court should not allow a jury verdict that was certainly influenced by improper trial tactics and prejudicial (reversible) errors to stand, leaving the Federal Circuit to remand as it sees fit, long after the original trial occurred. A new trial is necessary to prevent a miscarriage of justice.

## I.    LEGAL STANDARD

A district court has the power to grant a new trial under F.R.C.P. 59(a) "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a); *see also Riverwood Int'l Corp. v. R.A. Jones & Co., Inc.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003) (holding that regional circuit law applies to the procedural aspects of a motion for new trial). A court may grant a new trial if, for example, the "trial was unfair," "prejudicial error was committed in its course," or "the verdict is against the great weight of the evidence." *Smith v.*

*Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985); *see also Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998). "[I]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial." *Smith*, 773 F.2d at 613. Generally, "[I]f one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

Courts are to decide whether to grant a new trial based on their assessment of the fairness of the trial and the reliability of the jury's verdict. *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991). This decision lies within the discretion of the court. *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982). Where the party seeking the new trial has shown that it is reasonably clear that "prejudicial error has crept into the record or that substantial justice has not been done," a court should grant a new trial. *Streber v. Hunter*, 221 F.3d 701, 736 (5th Cir. 2000).

Unlike the standard of review for motions under Rule 50, the standard of review for a motion for new trial does not require this Court to: (1) view the evidence in the light most favorable to Phillips; or (2) exercise the same level of deference to the jury's verdict:

> The trial court's power to grant a new trial on the basis of the court's firm belief that the verdict is clearly contrary to the weight of the evidence has . . . "long been regarded as an integral part of trial by jury." In making this determination, the district court weighs all the evidence, but need not view it in the light most favorable to the nonmoving party. While the court is to respect the jury's collective wisdom and must not simply substitute its opinion for the jury's, "[i]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial."

*Smith*, 773 F.2d at 613 (citations omitted); *see also Rousseau v. Teledyne Movible Offshore, Inc.*, 812 F.2d 971, 972 (5th Cir. 1987) ("[A] verdict can be against the 'great weight of the evidence,' and thus justify a new trial, even if there is substantial evidence to support it").

## II.   ARGUMENT

### A.   A New Trial is Warranted As a Result of Phillips' Repeated Contradiction of the Court's Claim Construction Order.

"Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial." *Exergen Corp. v. Wal–Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). "No party may contradict the court's construction to a jury." *Id.* During the Docket Call, Magēmā raised Phillips' continuing refusal to abide by the claim construction. Phillips' represented that "we're <u>not</u> going to be making arguments that because what is being hydrotreated at Bayway is <u>lacking a residue</u>, that that's a reason to avoid infringement." Ex. H, Dkt. Call Tr. at 18:10-13 (emphasis added). Yet, during trial, Phillips' witness testified the claims required a residue:

> Q. Okay. So that's what we're talking about when we're talking about the patent claims?
> A. What I'm reading here is a low-sulfur heavy marine fuel oil and what <u>your patent defines a low-sulfur heavy marine fuel oil is a residue</u> that has a minimum asphaltene content.

Ex. C, Day 3 Tr. at 3-10:1-9 (Vauk) (emphasis added).[1] The Court construed the term "heavy marine fuel oil" in this case to mean "a petroleum product fuel compliant with the ISO 8217:2017 standard for bulk properties of residual marine fuels except for the concentration levels of the environmental contaminates." The Court rejected Phillips' repeated attempts throughout the case to define HMFO by its components. Summary Judgment Order (Dkt. No. 204) at 59-60 ("[T]he

---

[1] Ex. C, Day 3 Tr. at 3-48:11-16 ("Q. You were asked some questions about Table 2 for residual marine fuels. What is your understanding of a residual marine fuel? A. A residual marine fuel is something that contains metals, something that's viscous, and that it contains the residual product from a refinery.").

6

court declined to construe 'HMFO' in terms of components as argued by Defendants.").

Nonetheless, during trial, Phillips' witnesses refused to abide by the Court's construction:

> Q. So let me tell you what the construction is here. It's a petroleum product fuel compliant with ISO 8217 standard for bulk properties of residual marine fuels except for the concentration levels of environmental contaminants. And so the Court says that heavy marine fuel oil doesn't mean whatever ingredients that you're referring to, Mr. Vauk. It means what's compliant with ISO 8217, okay? So for purposes of today when I talk about a heavy marine fuel oil or a residual marine fuel oil, that's what I'm talking about. Do you understand that?
> A. I understand that's what you're saying, but I don't agree with what you're saying.

Ex. C, Day 3 Tr. at 3-10:1–11:14 (Vauk).[2] The contradiction of the Court's claim construction

order was not limited to Mr. Vauk. Phillips' technical expert, Dr. Sughrue, also told the jury that

a "distillate" cannot meet ISO 8217 Table 2. Ex. E, Day 5 Tr. at 5-160:9-16 ("I don't feel a distillate

will meet Table 2 specifications because the CCAI cannot be applied to a distillate low-viscosity.

It's outside the range of that correlation, so you're now misapplying that correlation."). Like Mr.

Vauk's proposed claim construction, Dr. Sughrue's argument was previously rejected. Dkt. 204,

Summary Judgment Order at 57 (addressing Phillips' argument about "whether distillate materials

that have completely boiled and vaporized can be considered a heavy marine fuel oil").

Dr. Sughrue's testimony was inconsistent with the Court's claim construction. Expert testimony

that reasserts a construction considered by the court during claim construction, and not adopted,

constitutes an improper contradiction of the Court's claim construction. *Liquid Dynamics Corp. v.

Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006); *ContentGuard Holdings, Inc. v. Apple

Inc.*, 701 F. App'x 957 (Fed. Cir. 2017).

---

[2] See also Ex. C, Day 3 Tr. at 3-8:4-11 (Vauk); *id.* at 3-47:3-16 ("Q. Sir, if your feed in is ISO 8217 compliant, it is a residual marine fuel oil as it's been defined by the Court. If it comes out and it's ISO 8217 compliant, which we looked at the chart and you agreed that it is, it is a residual marine fuel oil. Do you understand that? A. It's not a residual marine fuel oil until we sell it into a blend and make a fuel oil blend that's sold as a residual marine fuel oil.").

Presentation of evidence contradicting a Court's claim construction is error, even if the jury charge makes it clear that the Court's constructions control. *Cytologix Corp. v. Ventana Med. Sys.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005). In *CytoLogix*, the Federal Circuit held that expert testimony at trial "opin[ing] on claim construction before the jury" and counsel's "argu[ing] conflicting claim constructions to the jury" were "improper" due to the high "risk of confusing the jury." *Id.* Here, Phillips introduced testimony and argument contrary to the Court's construction.[3] Phillips' trial presentation flouted the Court's construction and sought to back-door its previously-rejected construction to the jury through other improper comparisons. This is prejudicial error due to the high degree of risk that it misled the jury to improperly find non-infringement based not on the Court's construction, but on Phillips' construction.

### B.   A New Trial is Warranted Because Phillips Argued Additional Requirements that Are Not Found in the Claims or Court's Constructions.

Phillips' trial strategy and closing arguments revolved around three "requirements" that are not found in either the asserted claims or in the Court's constructions. Specifically, Phillips repeatedly argued the following unsupported "requirements" were necessary to establish infringement:

1. Testing of actual physical samples
2. A compliant feed "before it hits any of the equipment"
3. A minimum viscosity

For patent infringement, the "requirements"—or claim limitations—are found in the claims themselves, as construed by the Court. *Zenith Lab'ys, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1424 (Fed. Cir. 1994) ("It is the claim that sets the metes and bounds of the invention entitled to the protection of the patent system."). As this Court instructed the jury, infringement requires

---

[3] And this tactic did not begin at trial. Throughout this case, Phillips refused to abide by the Court's claim construction. As a result of Phillips refusal to abide by the construction, the Court reaffirmed its claim construction during summary judgment.

a comparison of the accused products to the claims as construed. Because none of Phillips'

"requirements" are found in the claims themselves or in any claim construction, Phillips'

arguments that these requirements were necessary to establish infringement were prejudicial error.

First, with respect to testing, Phillips repeatedly argued that testing of an actual sample was

"required." From opening arguments, Phillips told the jury:

> ISO 8217 . . . "requires the use of actual specified ISO test procedures to prove
> compliance with the ISO 8217 specifications. Within ISO 8217, it lists the specific
> test method that you must follow, a particular ISO test method number. . . . You
> will not find anything in this document stating, suggesting, or implying that you
> can use an estimate to show compliance. If there's no compliance, there's no
> infringement.

Ex. A, Day 1 Tr. at 1-99:9-18 (emphasis added). This argument was re-iterated throughout trial[4]

and finally in the closing arguments. In instructing the jury to answer 'no' to infringement

Questions 1 and 2, Phillips' counsel told the jury:

> And you answer 'no' because that's consistent with there's no actual test data that
> shows compliance, none.

---

[4] And throughout trial, similar arguments and testimony can be found. Ex. B, Day 2 Tr. at 2-
147:15-22 ("Q. Right. These are the test methods that they say it shall be done by these methods,
right? A. Right. I guess it says: "shall," but yeah. Q. There is nothing in ISO 8217 that says, "Oh,
you can just use an estimate for that." That's not in ISO 8217, is it? A. There's no discussion of
estimates in ISO 8217 that I'm aware of."); id. at 2-148:8-17 ("Q. There is nothing in ISO 8217
that says it's okay to use an estimate as a substitute for 2719. We're not going to see that in there,
are we? A. Well, no, but Phillips told us it was okay to use -- Q. You are not going to see that in
ISO 8217, are you? A. No, you're not. Q. You are not going to see that in ISO 2719, are you? A.
ISO what? Oh -- Q. The required test method. A. No, I guess not."); Ex. C, Day 3 Tr. at 3-134:4-
14 ("Q. It's true, Mr. Klussmann, that there is nothing in ISO 8217 or these test methods or
reference -- required test methods that say that estimates are permitted to determine compliance,
right? . . . A. Nothing in the spec says that estimates to be used."); Ex. D, Day 4 Tr. 4-114:7-9 ("Q.
But you now know that ISO 8217 does not allow for any estimates for flash point to meet the spec,
correct? A. That's incorrect."); id. at 4-115:12-24 ("Q. Is there anything that's stated in this
document that says you can use estimates of flash point? A. You need to look in the book in which
the ISO put out containing the list of tests, and it allows in there for variation. . . . Q. Is there
anything mentioned there about estimates? A. No.").

Ex. F, Day 6 Tr. at 6-108:13-15 (emphasis added); *id.* at 6-97:3-5 ("We know what those required specifications and required test methods are."); *id.* at 6-97:11-12 ("Exhibit 10 [ISO 8217] tells you these are the test methods that you are to use to determine that.").[5] Phillips' fabrication of requirements that are not found in the claim language or this Court's construction for purposes of concocting a non-infringement argument constitutes prejudicial error and resulted in a verdict that is against the great weight of the evidence.

Second, with respect to Phillips' feed requirement, neither Claim 1 nor Claim 5 of the '884 Patent even use the word "feed" or "feedstock." Yet Phillips' counsel repeatedly told the jury during closing that: "The feedstock has to be compliant before it hits any of the equipment." *Id.* at 6-100:3-4; *id.* at 6-103:3-4 (same).[6] Phillips' witnesses testified that they derived this "requirement" from how "we [Phillips] define as the feed to the unit," Ex. C, Day 3 Tr. at 3-50:11-14, and from a figure showing one embodiment of the patented invention. *Id.* at 3-34:25–35:10 ("Q. . . . If you look at the Court's claim construction, there's nothing that says that? A. I'm saying in your patent you have a diagram that shows a diagram of your patented hydrotreating process

---

[5] The Court recognized the prejudicial impact of Phillips' repeated references to the need for "actual" tests to satisfy flash point during the arguments on Magēmā's Motion for Curative Instruction. Ex. E, Day 5 Tr. at 5-241:19-22 ("THE COURT: Yeah, but the problem is you didn't produce tests or provide a test method that could be used by Magēmā before the discovery cutoff. So how in the world could they possibly satisfy what you say is their burden?") (emphasis added). The Court advised Phillips to refrain from making those argument during closing. *Id.* at 5-243:6-9 ("But I'll be attuned by attempt[s] from any creative lawyer to get around my ruling during final argument, and I won's be reluctant to take appropriate action.") (emphasis added). Despite the warning, Phillips' counsel and Mr. Allen made no less that 5 references to "actual" or "required" or "right" tests methods or lab data on Day 6 of the trial. *See, e.g.*, Ex. F, Day 6 Tr. at 6-26:18, 97:3-4, 98:23, 106:10-13, and 108:12-15.

[6] *See also* Ex. D, Day 4 Tr. at 4-127:18-23 ("Q. Okay. So, again, your opinions provided here today on Wood River are dependent upon picking a point of compliance further into the unit than as it's entering the out – from coming from outside the battery limits? A. It's picking a point where you can analyze the feedstock as being representative of what goes into the reactor."); Ex. E, Day 5 Tr. at 5-116:7-9 ("Q. This quote at the bottom here, that heavy feedstock HMFO or the letter A, as identified in the figure, it states that it's fed from outside the battery limits or OSBL.").

and you say specifically that the fresh feed or the feedstock is the feed that enters the battery limits of the unit. That's what your patent says."). But this alleged requirement is not found anywhere in the claim language or the Court's construction. *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002) ("[I]nfringement is to be determined by comparing the claim to the accused device, not by comparing the accused device to the figures of the asserted patent"). Phillips' argument that Magēmā had to prove that the feed was compliant with ISO 8217 "before it hits any of the equipment" in order to establish infringement was prejudicial error and resulted in a verdict that is against the great weight of the evidence. Ex. F, Day 6 Tr. at 6-100:3-4

Third, with respect to Phillips' minimum viscosity requirement, Phillips' repeatedly told the jury that the Bayway feed and product could not be sold as a "residual marine fuel" because its viscosity is too low. Ex. E, Day 5 Tr. at 5-91:7-17 ("Q. . . . Can you sell Bayway feed as a residual marine fuel oil . . . ? . . . A. No, I cannot. The viscosity is too low.").[7] Phillips' based this on testimony that "[t]he Platts window requires the viscosity of the 0.5 barrel to be no less than 30 centistokes." *Id.* at 5-91:20–92:4. But the trial testimony also established that the Platts trading market on which Phillips relied did not even exist when the original patent was filed in 2017. *Id.* at 5-99:7-21 ("[T]here was no reason for Platts to have specs for 0.5" in 2017 because "[t]here was

---

[7] *See also* Ex. A, Day 1 Tr. at 1-97:17-21 ("You'll hear from Mr. Swaim and Mr. Monsalve about how they can't sell the feed that goes into the hydrotreating unit at Bayway as a residual marine fuel oil. They can sell it as a cutter -- you'll hear that term -- but that's not a residual marine fuel oil."); Ex. E, Day 5 Tr. at 5-93:4-17 ("Q. Now, let's be fair, Mr. Monsalve. I mean, can the feed at Bayway be sold -- even though not as a marine fuel oil, a residual marine fuel oil, but can it be sold as something else? A. Oh, absolutely. Everything can be sold. Q. For example? A. It can be sold like cutter. There's a lot of barrels, because the viscosity is low, it can be used as a cutter in the marine fuel markets, yes. . . . Q. Is a cutter a residual marine fuel oil? A. A cutter will not -- would not -- will not be a residual marine fuel oil. It will be part of a blended barrel, yes."); Ex. F, Day 6 Tr. at 6-106:16-23 ("Mr. Monsalve, who told you, "I can't sell this feed" -- not the product. He can sell the product. "I can't sell the feed because it's too viscous. [*sic*] A ship owner won't buy it because its engine will break down.").

no 0.5 market at that time"). The claims cannot include a minimum viscosity "requirement" based on trading market that did not exist at the time of the invention. Again, there is no such requirement found in the actual claim language or in this Court's constructions. Nothing in the claims or in ISO 8217 Table 2 imposes a <u>minimum</u> viscosity. Phillips' non-infringement arguments based on "requirements" that are not found in the actual claim language or this Court's constructions constitute prejudicial error and resulted in a jury verdict that is against the great weight of the evidence.

###### C.    Phillips Violated This Court's Order Excluding Inadmissible Evidence.

As for the Court's Order excluding Bayway evidence, Phillips' counsel adopted an "ask for forgiveness not permission" approach. Rather than requesting a sidebar to obtain the Court's approval before referring to prejudicial and excluded evidence, Phillips' counsel took the Court's gatekeeping function out of the Court's hands. Phillips brazenly referred to excluded evidence before the jury:

> Q. And it's not in ISO 8217, is it?
> A. It's not, but again, it's assumed that the fuel tested would be physically available, the correct materials to be tested.
> Q. And Phillips 66 provided you and offered to provide you with samples, didn't it, in this lawsuit?
> A. They didn't provide the correct samples.
> Q. They offered to, didn't they?
> A. They didn't provide the correct samples.
> Q. They offered to, didn't they?
> A. After close of discovery and changes to operation is my understanding of –

Ex. C, Day 3 Tr. at 3-140:11-22. In referring to this excluded evidence, Phillips' counsel knew what they were doing, they knew the reward, and they disregarded the risk. *Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.*, 772 F.3d 1031, 1034 (5th Cir. 2014) (affirming grant of new trial after counsel improperly elicited testimony concerning a prior

settlement demand, in violation of a motion in limine). What was done could not be undone. This was highly prejudicial error and created the false appearance to the jury that Phillips had *all along* offered Magēmā the requested samples. As this Court knows, however, Magēmā moved to compel those samples, but was denied. Only after summary judgment briefing was complete and Phillips perceived a risk that the burden of proving infringement may shift to them as a result of Magēmā's 35 U.S.C. § 295 motion, did Phillips belatedly proffer the requested samples, and for the Bayway refinery only.

Magēmā requested a curative instruction in connection with Phillips' reference to the excluded evidence and the related "actual testing" argument, which this Court denied. Ex. E, Day 5 Tr. at 5-243:1-9. In denying the curative instruction, the Court may have been under the mistaken impression that Magēmā's counsel had elicited testimony related to the production of the excluded Bayway samples. *Id.* at 5-236:19–237:8. The testimony that Magēmā believes the Court was referring to at the time was related to the Wood River refinery. Ex. C, Day 3 Tr. at 3-34:12–35:2. There is no dispute that Phillips 66 never (even belatedly) offered samples from the requested sample point for the Wood River Refinery.

The prejudicial error was already committed. When taken together with Phillips' other improper trial tactics—including the unsupported "requirement" for actual testing—Phillips' reference to excluded evidence renders the jury verdict unreliable and a new trial is warranted to prevent a miscarriage of justice.

13

### D. Phillips Introduced Legal Error By Improperly Comparing its Refinery Processes to the Rigby Process.

Phillips' engaged in improper and misleading comparisons between Phillips' refinery processes and a single commercial embodiment of the patented invention referred to as the Rigby Process. Specifically, Phillips argued:

> Now, what do I mean by that? We're talking about very different hydrotreaters. This Rigby process that Mr. Moore and Mr. Klussmann were pitching to Phillips 66 and a whole bunch of other people, that nobody ever wanted, was relying on what's called a residual hydrotreater or a resid hydrotreater. Well, Phillips knew about that. They had one at one time out in West Texas, in Borger. The resid hydrotreater operates at a much higher pressure and puts a lot more stress on the catalysts. What Wood River and Bayway do, Wood River operates on a slurry hydrotreater, and Bayway is called a gas oil hydrotreater. They operate very differently.

Ex. A, Day 1 Tr. at 1-92:23–93:9.[8] Phillips argued that the processes used in its refineries are different from the Rigby Process because Phillips uses a "gas oil" hydrotreater, or a "slurry" hydrotreater, instead of a Rigby Process "residual" hydrotreater (which was not a factually accurate description of the Rigby Process hydrotreater). This was a transparent ploy by Phillips to

---

[8] Other examples of similar testimony and arguments can be found throughout the record. *See* Ex. B, Day 2 Tr. at 2-237:25–238:6 ("Q. All right. What did you understand was the type of hydrotreater they were proposing to use? A. They were specifically proposing a residual fuel hydrotreater. Q. And what was the feed into that hydrotreater? A. It was hydrotreating residual fuel oils that were compliant with the ISO 8217 regulation."); *id.* at 2-238:17–239:14; *Id.* at 2-239:15-19 ("Q. Did the information that Rigby provided you about its residual hydrotreater have any impact on your plans to use a gas oil or slurry hydrotreater at your refineries? A. No. It had nothing to do with what we implemented eventually, no."); Ex. D, Day 4 Tr. at 4-255:21-25 ("Q. Are you familiar with residue hydrotreaters? A. I am. Q. Would there be technical differences between the slurry hydrotreater and a residual hydrotreater? A. Yes."); Ex. E, Day 5 Tr. at 5-29:14-19 ("Q. So I understand, then, what we've got is that you were told that your feedstock at Lake Charles, the slurry, wasn't going to work with their hypothetical hydrotreater, and their feed was not going to work on your hydrotreater at Wood River, right? A. That's correct."); Ex. F, Day 6 Tr. at 6-95:10-14 ("The suspicions are not backed up by any documented facts. And you see this - - saw this from the opening statement. Of course, we didn't do what they're doing. Different hydrotreaters, different feed, totally different start-up and operating plans.") (emphasis added).

circumvent the Court's claim construction, which precluded Phillips from distinguishing the accused processes based on components.

But this ploy only served to further compound the prejudicial errors. A fundamental legal principle of patent infringement is that comparisons must be made between the accused product and the claims, not to narrower commercial embodiments. *Zenith*, 19 F.3d at 1423 ("As we have repeatedly said, it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent."). This fundamental principle has been repeatedly upheld throughout the years. *Myco Indus., Inc. v. BlephEx, LLC*, 955 F.3d 1, 15 (Fed. Cir. 2020) ("The law is clear . . . that 'infringement is determined on the basis of the claims, not on the basis of a comparison with the patentee's commercial embodiment of the claimed invention.'"); *ACCO Brands, Inc. v. Micro Security Devices, Inc.*, 346 F.3d 1075, 1081–82 (Fed. Cir. 2003) (The "language of the claim, not the patent owner's commercial product, is the measure of infringement."); *Fleet Engineers, Inc. v. Mudguard Techs., LLC*, 761 F. App'x 989, 992 (Fed. Cir. 2019) (district court erred in comparing the accused product to the patentee's product).

Here, the Rigby Process is just one embodiment of the broader asserted claims. Comparison of Phillips' accused processes to the single, narrower commercial embodiment of the Rigby Process misled the jury into believing that the claims were narrower in scope than they actually are. For example, Phillips' misleading comparison created the inaccurate impression that the claims would not cover "different hydrotreaters," "different feeds," and "different start-up and operating plans." Ex. F, Day 6 Tr. at 6-95:10-14. This cannot be reconciled with the claim language as construed. Moreover, this improper comparison conflated the jury's task to compare Phillips' accused products to the asserted claims with additional, confusing, and irrelevant comparisons to

the Rigby Process. Expecting the jury to keep these improper comparisons distinct from its infringement determination was unreasonable. This placed an impossible task on the jury, and ultimately, constitutes a prejudicial error that warrants a new trial.

**E.    A New Trial Is Warranted As a Result of Phillips' Trial Tactics When Considered as a Whole.**

Phillips' improper trial tactics were not limited to the conduct specifically identified in the preceding sections. Rather, the improper trial tactics permeated all aspects of the trial, rendering the entire trial unfair. *Winter v. Brenner Tank, Inc.*, 926 F.2d 468, 473 (5th Cir. 1991) (noting that "defense counsel's misconduct in the form of improper questioning" warrants a new trial where it is "so pronounced and persistent that it permeates the entire proceeding"). The Fifth Circuit considers "the comments of counsel, the counsel's trial tactics as a whole, the evidence presented, and the ultimate verdict" in determining whether "manifest injustice" warranting a new trial has occurred, even if no objection was made at the time. *Alaniz v. ZamoraQuezada*, 591 F.3d 761, 778 (5th Cir. 2009) (emphasis added) (quoting *Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 765 (5th Cir. 1989)); *Hall v. Freese*, 735 F.2d 956, 961 (5th Cir. 1984) (recounting Fifth Circuit "rule that improper argument may be the basis for a new trial where no objection has been raised only 'where the interest of substantial justice is at stake'" (quoting *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975))).

**1.    Phillips Misled the Jury with Its Legally Erroneous Argument that Because There was no NDA in Place, Phillips was Free to use the Patented Technology Without Authorization.**

Seeking to distract from the question of patent infringement, Phillips repeatedly sought to mislead and confuse the jury into believing that Phillips was free to use the patented technology because there was no non-disclosure agreement between the parties. This culminated, in closing, when Phillips' counsel argued:

16

> There's something interesting that Magēmā never told you, and anybody involved in the patent process knows this. And that is that you can take anything, any information you want from a meeting, as long as there's no nondisclosure agreement -- and that's undisputed there was none.

Ex. F, Day 6 Tr. at 6-95:15-21.[9] This is not a trade secret case; there is no obligation to keep a patented (or patent-pending) technology secret using non-disclosure agreements (NDA) in order to preserve a claim of patent infringement if the disclosed technology is later used without authorization. If the technology is patented, then you cannot "take anything" unprotected by an NDA. By asserting such use was proper "as long as there's no nondisclosure agreement," Phillips' counsel misled the jury as to the law. And, given that NDAs were not at issue, the jury charge did not include any instruction related to NDAs to cure Phillips' blatant misstatement. Further, Magēmā was not hiding anything from the jury as Phillips' counsel suggested by saying: "[t]here's something interesting that Magēmā never told you, and anybody involved in the patent process knows this." Ex. F, Day 6 Tr. at 6-95:15-21. A legally erroneous instruction, such as this, constitutes prejudicial error and further underscores the cumulative impact of Phillips' improper trial tactics.

### 2. Phillips Improperly Argued that the Patents Were Not Patentable and Improperly Implied that Phillips Invented the Patented Technology First.

Phillips dropped its claims of invalidity only to question Magēmā's patents before the jury at trial, while simultaneously avoiding the constraint of the law that defines invalidity as well as

---

[9] *See also* Ex. A, Day 1 Tr. at 1-91:6-14 ("In fact, folks, absolutely at no time did Phillips 66 agree to or sign a nondisclosure agreement with Rigby or Magēmā. Instead, what was presented at this April 2017 meeting -- and you will hear -- Mr. Moore and Mr. Klussmann have to admit it -- there wasn't anything there that was confidential. They were sharing it freely with Phillips 66."); Ex. B, Day 2 Tr. at 2-95:9-14 ("Q. You had no nondisclosure agreement with Phillips 66 before this meeting, right? A. We didn't. Q. You never had a nondisclosure agreement with Phillips, right? A. No, we didn't."); *id.* at 2-97:12-18 ("Q. And you knew this. And you knew that while you had all the hope in the world that you would get this patent, you still asked Phillips 66, after this meeting, for a nondisclosure agreement, right? A. Yes. That's our standard practice.").

17

the clear and convincing burden of proof required to prove it. For example, Mr. Vauk testified:

> Q. As part of the projects at Bayway or Wood River, did you or anyone else at Phillips 66 pursue any patents?
>
> A. No, we didn't pursue any patents because these were technologies that had been practiced for many years at the refinery, and there was nothing patentable about the solution that we came up with.

Ex. B, Day 2 Tr. at 2-245:15-20.[10] The testimony created the improper implication to the jury that Magēmā's patents covering those solutions were not novel and not patentable. Phillips further sought to undermine the patents' novelty by arguing that it was the first to come up with the solutions that were implemented at the Bayway (and Wood River) refineries. Ex. F, Day 6 Tr. at 6-87:22–88:25 ("Mr. Witte came up with this idea . . .  That idea was not only in Mr. Witte's head, but he wrote it down well before there was any discussion at all with these Rigby personnel. . . . Mr. Vauk . . . came up with the idea . . .").  Phillips improperly put these concepts before the jury, but not under any actual legal framework or encumbered with the requisite burden of proof required for such theories. To cure Phillips' improper argument, Magēmā sought to introduce evidence of the Patent Office's denial of Phillips' petitions for *inter partes* review, which this Court denied. Ex. C, Day 3 Tr. at 43:14-44:9. Phillips' arguments constitutes prejudicial error and further underscores the cumulative impact of its improper trial tactics.

### 3. Phillips' Improper Use of Unlabeled and Misleading Samples with the Jury.

The samples that Phillips brought to trial were improper and misleading, collected at an unknown time, from unknown location, and from an unknown mode of operation that was never

---

[10] *See also* Ex. C, Day 3 Tr. at 3-39:25–40:8 ("A. I said I didn't think that they would get the patents at that time. Q. And yesterday Mr. Walker asked you about why you didn't file patents and you testified yesterday you didn't think the solution was patentable, correct? A. I said yesterday that the solution that we're using at the refineries -- at the Bayway and the Wood River refineries was what we've been using for many years and not patentable, that's correct.")

confirmed. Phillips never even attempted to lay the proper foundation for its samples. If Phillips had brought in samples of motor oil from AutoZone, we would not know it. Mr. Vauk, who introduced the Bayway samples for Phillips, testified that he "did not arrange for the sample," and "[didn't] know exactly when it was taken." Ex. C, Day 3 Tr. at 3-26:25–27:1. Mr. Vauk also could not "confirm what mode of operation the unit was in when the sample was collected." *Id.* at 3-27:4-6. When Phillips used the Bayway samples again with Mr. Allen, he also "did not take those samples," confirmed that the samples were "not labeled with any dates or times," and confirmed that he "had no idea where those samples came from, when they were taken." Ex. F, Day 6 Tr. at 6-34:3-10.  No witness was able to confirm when the samples were taken, which was critical because Phillips switched modes of operation in January 2023. Phillips' trial samples were visually different from the samples provided to Magēmā when Bayway was operating in the accused IMO mode. Ex. C, Day 3 Tr. at 3-27:16-20. Nonetheless, Phillips used the samples as representative of the "components that are used to make marine fuel oil at Bayway." Ex. B, Day 2 Tr. at 2-218:9–219:24; Ex. F, Day 6 Tr. at 6-11:5–12:7. It was highly prejudicial for Phillips to use samples at trial that were collected at an unknown time, and unknown location, and from an unknown mode of operation that was never accused. Again, this further establishes the cumulative impact of its improper trial tactics.

>    **4.    Phillips' Counsel Made Factually Incorrect and Prejudicial Closing Arguments to the Jury.**

During closing, Phillips' counsel completely misrepresented an argument that Magēmā's infringement theory about light gases being removed from the feed was wrong because "alarm bells" would have gone off in the refinery if gases were removed as Magēmā contended:

> But, folks, there's no way I can put it any plainer than this. This wrong place to sample is wrong because if it were true and <u>gases were coming out at the surge drum</u>, <u>all hell would have broken loose at the refinery</u>. Alarm bells would have gone

on. Because what's one of the most dangerous conditions in a refinery? Escaping
gas. <u>And that has never happened</u>.

Ex. F, Day 6 Tr. at 6-104:3-9 (emphasis added). There was absolutely no support for this argument.

In fact, Bayway's former technical manager and current maintenance manager, Mr. Allen, testified

that the D-101 vapor disengaging drum is "designed that it can vent gases" and that "if there are

gases present, it could vent gases." *Id.* at 6-38:14-24. Phillips' closing argument also contradicts

its own documents. Mr. Allen agreed that PTX 658 (Dkt. 279-35, PTX-658) describes "[G]<u>as</u>

<u>vented from the drum</u>'" –speaking of the D-101 drum–"<u>flows to the vacuum line t</u>hat is used for

overhead gas from the product fractionator T104." Ex. F, Day 6 Tr. at 6-39:7-13 (emphasis added).

Mr. Allen testified that "if there was <u>gasoline-type</u> molecules going down there with <u>high flows</u> or

<u>high amounts</u>, it would overwhelm that system." *Id.* at 6-28:8-10 (emphasis added). He did <u>not</u>

testify that if any gases were coming out at the surge drum "all hell would have broken loose."

Phillips' counsel deliberately misrepresented this critical point. In fact, Dr. Loezos's testimony

was clear that "removing small amounts. . . has a dramatic impact on flash." Ex. C, Day 3 Tr. at

3-206:9-10; *id.* at 3-188:24-25. Mr. Allen appears to agree. Ex. F, Day 6 Tr. at 6-25:22-23 ("[I]t's

present in small amounts.").

     Phillips' closing argument was not only completely misrepresented, it was also

exceedingly prejudicial. A new trial is required "[w]here placing material facts not in evidence

before the jury in final argument substantially prejudices a party." *Edwards v. Sears, Roebuck &*

*Co.*, 512 F.2d 276, 284–86 (5th Cir. 1975); *Hall*, 735 F.2d at 960–961 (granting a new trial where,

*inter alia*, counsel made false remarks during closing). *Nissho–Iwai Co., Ltd. v. Occidental Crude*

*Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988) (a "district court may order a new trial if improper

closing argument irreparably prejudices a jury verdict"). Contrary to the evidence of record,

Phillips' counsel told the jury that Magēmā's infringement theory was implausible. Ex. F, Day 6 Tr. at 6-104:6-9. ("[A]ll hell would have broken loose at the refinery . . . this has never happened.").

Phillips' counsel then proceeded to tell the jury that Magēmā's evidence was "made up" and improperly imposed his own personal assessment of credibility upon the jury. *Id.* at 6-103:5-10 ("That is not credible evidence. That is not proof by a preponderance of the evidence. That's made up."); *id.* at 6-98:16-17 ("And these folks have just accused Mr. Matthews of perjury. You saw him. That is not a credible argument."). This is not the only example of unsupported statements in Phillips' closing arguments. Phillips' counsel also argued about designing around the patented technology – "It's just not that hard." *Id.* at 6-96:7-14. Yet the quote he references was never discussed by any witness at trial nor did any technical witness offer any opinion that it would or would not be difficult to design around the patents. These significant and prejudicial statements in Phillips' closing arguments—in addition to others discussed in preceding sections—lacked evidentiary basis.

### F.   The Jury's Verdict of No Infringement is Against the Great Weight of the Evidence.

The jury's verdict that Phillips' Bayway refinery did not infringe Claims 1 and 5 of the '884 Patent is against the great weight of the evidence. During its opening, Phillips identified two non-infringement arguments relevant to Bayway: (1) flash point prior to hydroprocessing and (2) merchantable. Ex. A, Day 1 Tr. at 1-94:14-19. Notably, the merchantable limitation is *only* in Claim 1 of the '884 Patent. Independent Claim 5 of the '884 Patent does not include a merchantable limitation.

As discussed in the preceding sections, Phillips' argument that the claim language "required" a minimum viscosity in order to be merchantable is based on a Platts trading market that did not even exist until after the sulfur limit took effect in 2020. Ex. E, Day 5 Tr. at 5-99:7-

21. This was long after the filing of the original patent in February 2017. *Id.* Nothing in the asserted claims or the Court's construction imposed a minimum viscosity requirement. When asked whether the patent required a minimum viscosity, Phillips' witness on this topic (Mr. Monsalve) answered that he didn't know. *Id* at 5-99:7-14. Phillips' argument must be rejected. Setting aside Phillips' minimum viscosity requirement, the evidence at trial established that merchantable requires the absence of deleterious materials that would react, fall out of solution or cause a ship to shut down. Ex. B, Day 2 Tr. at 2-11:7-11. Dr. Speight testified that he found no deleterious materials in Phillips' Bayway feed. Ex. D, Day 4 Tr. at 4-50:7–51:23. Phillips' presented no contrary evidence.

With respect to the flash point of prior to hydroprocessing, based on the claim language as construed by the Court, there is no requirement that Magēmā provide "actual tests" instead of the calculations, models, and other evidence on which it relied (summarized below). Nor is there a requirement that Magēmā test the flash point of the feed entering from outside a refinery's arbitrarily set battery limits instead of in accordance with the literal words of the claim which require compliance "prior to hydroprocessing." Hydroprocessing occurs in the reactor where hydrogen, feed, and catalysts undergo reactions.  Phillips improperly manufactured these two requirements because it did not develop independent evidence of the flash point after D-101 during the proper discovery period. Because Phillips had no admissible evidence to contradict Magēmā's evidence, it resorted to arguments about testing feed from outside the battery limits and actual testing is required. But because the claim language as construed controls the analysis, Phillips additional requirements are irrelevant.

The evidence at trial establishes that the D-101 vapor disengaging drum is designed to and is operated such that it "could" remove gases. *See supra* Section E.4 (discussing Mr. Allen and Dr.

Loezos's testimony). Mr. Allen's deposition testimony further established that light molecules vaporize from the DSU-1 fresh feed when at ambient (room) temperature and pressure. Ex. C, Day 3 Tr. at 3-162:4-16. The light ends are gas <u>not</u> liquid at such temperatures and pressures. *Id.*; *see also* Ex. F, Day 6 Tr. at 6-41:21– 42:2 ("Many of the light molecules <u>boil</u> below 250 degrees [F]") (emphasis added).

Phillips' witnesses agreed that the D-101 vapor disengaging drum enables light gas bubbles to disengage from the feed. Ex. E, Day 5 Tr. at 5-165:21-25 (Dr. Sughrue agreed he testified this in his deposition); Ex. F, Day 6 Tr. at 6-40:16-21 (Mr. Allen also agreed with this). However, at trial, Dr. Sughrue changed his answer, testifying: "I went back and read my report. I was speaking about steam bubbles." Ex. E, Day 5 Tr. at 5-165:25–166:8. Mr. Allen, however, found this answer implausible. Ex. F, Day 6 Tr. at 6-39:22–40:12 ("I'm not aware that there should be much water in that drum."); *Id.* at 6-40:25–41:4 (wasn't aware of water vapor being disengaged in D-101). In fact, Mr. Allen agreed that "if we believe Dr. Sughrue that water vapors are being disengaged in D-101, that would include the light hydrocarbons that affect flash." *Id.* at 6-41:21–42:6. Consequently, even if Phillips' technical expert's testimony is accepted, the Bayway employee responsible for DSU-1 testified that the conclusion remains the light hydrocarbons are disengaged in D-101.

Magēmā's technical expert, Dr. Loezos, provided testimony about what the flash point would be prior to hydroprocessing upon the removal of gases. This included: (1) Hysys modeling with flash point[11]–using Phillips' produced Hysys pseudo-components;[12] and (2) SGS testing of an actual sample designed to mimic the operation the vapor disengaging drum.[13] Dr. Speight

[11] *See* Dkt. 277-1, PTX 590, Ex. C, Day 3 Tr. at 3-198:5–199:3.

[12] *See* Dkt. 274-8, PTX 314, Ex. C, Day 3 Tr. at 3-195:10–196:25.

[13] *See* Dkt. 277-2, PTX 591, Ex. C, Day 3 Tr. at 3-191:9–192:18.

further provided testimony and evidence using Riazi calculations. *See* Dkt. 279-29, PTX 606; Dkt. 277-3, PTX 593. Dr. Speight explained that use of the T10 of the fresh feed was intended to model the flash point after the removal of light hydrocarbons that would have contributed to the boiling curve below the T10. Ex. D, Day 4 Tr. at 4-41:2-5; *id.* at 4-157:22–158:13; *id.* at 4-159:1-11. Phillips' criticism of the reliability of the Riazi calculations was that it did not accurately predict the flash point of the fresh feed. Phillips, however, did not offer evidence or testimony about Riazi's ability to accurately predict the flash point <u>after</u> vapors are disengaged in D-101. Magēmā's evidence further included Phillips' safety data sheet ("SDS") for the Bayway feed shipped to Bartlesville for pilot testing.  *See* Dkt. 273-7, PTX 130, together with Mr. Monsalve's testimony that the flash point provided on the SDS met ISO 8217 Table 2 and would be accurate. Ex. E, Day 5 Tr. at 5-100:17–104:13.

In sum, the jury's verdict that Phillips' Bayway refinery did not infringe Claims 1 and 5 of the '884 Patent is against the great weight of the evidence presented at trial. This further establishes that the jury's findings were impeded by Phillips' prejudicial errors and improper trial tactics.

## III.    CONCLUSION

Phillips' trial strategy was to distract the jury from the actual issues that they were tasked to decide. The cumulative violations of the Court's claim construction order, Phillips' reference to excluded evidence, Phillips' fabrication of requirements not present in the claims or constructions, and other improper arguments warrant a new trial to allow justice to be served. The right to a fair trial must be given meaning, and Phillips must be held to account for its campaign of confusion and misdirection that "permeated" the trial and was "calculated to prejudice" Magēmā. *Edwards*, 512 F.2d at 285-86; *see also, e.g.*, *Whitehead v. Food Max of Mississippi, Inc.*, 163 F.3d 265, 278 (5th Cir. 1998) ("Of course, we need not find that each statement, taken individually, was so improper as to warrant a new trial. Rather, taken as a whole, these comments prejudiced the jury's

24

findings . . . .”). While the relief requested is rarely granted by this Court, the events of leading up

to and through trial warrant granting one here.

Dated:  August 3, 2023                        Respectfully submitted,

                                              */s/ Miranda Y. Jones*
                                              Miranda Y. Jones
                                              *Attorney-in-Charge*
                                              Texas Bar No. 24065519
                                              Southern District ID No. 1147635
                                              MJones@porterhedges.com
                                              Stephen H. Lee
                                              Texas Bar No. 00791092
                                              Southern District ID No. 18313
                                              SLee@porterhedges.com
                                              Joseph D. Cohen
                                              Texas Bar No. 04508369
                                              Southern District ID No. 14710
                                              JCohen@porterhedges.com
                                              Sarah J. Ring
                                              Texas Bar No. 24056213
                                              Southern District ID No. 680173
                                              SRing@porterhedges.com
                                              **PORTER HEDGES LLP**
                                              1000 Main Street, 36th Floor
                                              Houston, TX 77002
                                              Telephone: 713-226-6000
                                              Facsimile: 713-228-1331

                                              ***Attorneys for Plaintiff***
                                              ***Magēmā Technology LLC***

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of August 2023, the foregoing was filed electronically through the Court's electronic filing system which constitutes service on those registered as filing users of the system.

/s/ *Miranda Y. Jones*
Miranda Y. Jones

27