United States District Court
Southern District of Texas
**ENTERED**
November 30, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MAGĒMĀ TECHNOLOGY LLC,            §
                                  §
            Plaintiff,            §
                                  §
v.                                §          CIVIL ACTION NO. H-20-2444
                                  §
PHILLIPS 66, PHILLIPS 66 CO.,     §
and WRB REFINING L.P.,            §
                                  §
            Defendants.           §


## MEMORANDUM OPINION AND ORDER

This action was filed by plaintiff, Magēmā Technology LLC ("Magēmā"), against defendants, Phillips 66, Phillips 66 Company, and WRB Refining L.P. (collectively, "Defendants"), under the Patent Act of the United States, 35 U.S.C. § 101, _et seq._, for alleged infringement of four United States Patents for refining marine fuel oil.[1]  A seven-day jury trial was conducted between June 26 and July 6, 2023,[2] at which time infringement of only two

---

[1]Complaint for Patent Infringement ("Plaintiff's Complaint"), Docket Entry No. 1.

[2]_See_ Minute Entry for First Day of Jury Trial, June 26, 2023, Docket Entry No. 238; Minute Entry for Second Day of Jury Trial, June 27, 2023, Docket Entry No. 241; Minute Entry for Third Day of Jury Trial, June 28, 2023, Docket Entry No. 244; Minute Entry for Fourth Day of Jury Trial, June 29, 2023, Docket Entry No. 246; Minute Entry for Fifth Day of Jury Trial, June 30, 2023, Docket Entry No. 250; Minute Entry for Sixth Day of Jury Trial, July 5, 2023, Docket Entry No. 253; and Minute Entry for Seventh Day of Jury Trial, July 6, 2023, Docket Entry No. 257.  _See also_ Trial Transcript Day 1, Docket Entry No. 284; Trial Transcript Day 2, Docket Entry No. 285; Trial Transcript Day 3, Docket Entry No. 286;
(continued...)

patents remained at issue: (1) United States Patent No. 10,308,884 ("the '884 Patent"), entitled "Heavy Marine Fuel Oil Composition," issued on June 4, 2019;[3] and (2) United States Patent No. 10,604,709 ("the '709 Patent"), entitled "Multi-Stage Device and Process for Production of a Low Sulfur Heavy Marine Fuel Oil from Distressed Heavy Fuel Oil Materials," issued on March 31, 2020.[4]  The jury found no infringement of either patent,[5] and on July 6, 2023, the court entered a Final Judgment (Docket Entry No. 263) ordering that Magēmā take-nothing from the Defendants. Pending before the court is Magēmā's Rule 59 Motion for New Trial ("Magēmā's MNT") (Docket Entry No. 292), Defendants' Response to Plaintiff's Rule 59 Motion for a New Trial ("Defendants' Response to Magēmā's MNT") (Docket Entry No. 293), and Magēmā's Reply in Support of Its Rule 59 Motion for New Trial ("Magēmā's Reply") (Docket Entry No. 294).  For the reasons stated below Magēmā's MNT will be denied.

---

[2](...continued)
Trial Transcript Day 4, Docket Entry No. 287; Trial Transcript Day 5, Docket Entry No. 288; Trial Transcript Day 6, Docket Entry No. 289; and Trial Transcript Day 7, Docket Entry No. 290.

   [3]Exhibit 1 to Plaintiff's Complaint, Docket Entry No. 1-1.

   [4]Exhibit 3 to Plaintiff's Complaint, Docket Entry No. 1-3.

   [5]Verdict Form, Docket Entry Nos. 262 (redacted, and 262-1 (unredacted).

# I. __Technical Background and the Alleged Infringement at Issue__

## A.   Technical Background

The asserted patents teach a process for making low sulfur heavy marine fuel oil ("HMFO") that complies with two industry standards: (1) International Standards Organization 8217:2017 ("ISO 8217:2017"); and (2) Revised Annex VI to MARPOL (the International Convention for the Prevention of Pollution from Ships). ISO 8217:2017 contains standards for bulk properties of marine fuels, which are organized into two families: "Distillate marine fuels" identified in ISO 8217 Table 1 ("Table 1"), which are not covered by the claims of the asserted patents; and "Residual marine fuels" identified in ISO 8217 Table 2 ("Table 2"), which are covered by the claims of the asserted patents.[6]  Table 2 sets forth sixteen physical properties for "Residual marine fuels," only one of which is at issue in the pending motion: flash point. Revised Annex VI to MARPOL reduced the maximum sulfur content of marine fuels from 3.5% by weight to 0.5% effective 2020 ("IMO 2020"). The asserted patents involve hydroprocessing (or hydrotreating) ISO 8217:2017 Table 2 compliant HMFO with a sulfur content greater than 0.5%, to reduce the sulfur to less than 0.5% to comply with the IMO 2020 Sulfur Cap.

---

[6] ISO 8217 Sixth Edition 2017-03, pp. 8-11, Plaintiff's Trial Exhibit 13, Docket Entry No. 272-5, pp. 14-17, and Defendants' Trial Exhibit 10, Docket Entry No. 267-3, pp. 14-17.  Page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

In general, hydroprocessing (or hydrotreating) exposes liquid petroleum products to hydrogen at elevated temperatures and pressures in the presence of a catalyst to promote the chemical change of sulfur into hydrogen sulfide gas that can be removed from the liquid petroleum products.  Important to the pending motion is that ISO 8217 Table 2 requires a minimum flash point of 60° C (140° F).[7]  Flash point represents the lowest temperature at which a liquid will form a vapor in the air near its surface that will "flash" or briefly ignite when exposed to an open flame, thus indicating the flammability or combustability of a liquid.[8]

**B.   Alleged Infringement at Issue**

Magēmā argues that a new trial is warranted because

> evaluating the evidence, [Defendants'] trial tactics, and the ultimate verdict of the jury — demonstrates substantial justice has not been done.  When properly focused on the actual claim language as construed, the overwhelming weight of evidence demonstrates that [Defendants'] Bayway Refinery infringes Claims 1 and 5 of the '884 Patent.  Magēmā seeks a new trial on these grounds . . .[9]

---

[7]Id. at 4, Plaintiff's Trial Exhibit 13, Docket Entry No. 272-5, p. 10, and Defendants' Trial Exhibit 10, Docket Entry No. 267-3, p. 10.

[8]See Memorandum Opinion and Order, Docket Entry No. 204, p. 17.

[9]Magēmā's MNT, Docket Entry No. 292, p. 9.  See also Magēmā's Reply, Docket Entry No. 294, p. 3.

Claims 1 and 5 of the '884 Patent state:

> 1.   A low sulfur heavy marine fuel oil, consisting essentially of a 100% hydroprocessed high sulfur heavy marine fuel oil, wherein **prior to hydroprocessing** the high sulfur heavy marine fuel oil **is compliant with ISO 8217:2017** and **is of merchantable quality as a residual marine fuel oil** but has a sulfur content (ISO 14596 or ISO 8754) greater than 0.5% wt. and wherein the low sulfur heavy marine fuel oil is compliant with ISO 8217: 2017 and **is of merchantable quality as a residual marine fuel oil** and has a sulfur content (ISO 14596 or ISO 8754) less than 0.5 wt %.

> . . .

> 5.   A low sulfur hydrocarbon fuel composition consisting essentially of: a majority by volume of a 100% hydroprocessed high sulfur residual marine fuel oil and a minority by volume of Diluent Materials, **wherein prior to hydroprocessing** the high sulfur **heavy marine fuel oil is compliant with ISO 8217:2017** but has a sulfur content (ISO 14596 or ISO 8754) greater than 0.5 wt %; and wherein the low sulfur **heavy marine fuel composition is compliant with ISO 8217:2017** and has a sulfur content (ISO 14596 or ISO 8754) less than 0.5 wt %; . . .[10]

The inventors named in the '884 Patent are Bertrand R. Klussmann ("Klussmann") and Michael J. Moore ("Moore").

Defendants argue that a new trial is not warranted because Magēmā failed to raise at trial all but one of the issues on which its MNT is based, and because all of the issues raised in the MNT lack merit.[11]

---

[10] '884 Patent, Exhibit 1 to Plaintiff's Complaint, Docket Entry No. 1-1, p. 18 (emphasis added).

[11] Defendants' Response to Magēmā's MNT, Docket Entry No. 293, p. 6.

## II. <u>Standard of Review</u>

Magēmā seeks a new trial citing Federal Rule of Civil Procedure 59(a)(1), and <u>Riverwood International Corp. v. R.A. Jones & Co., Inc.</u>, 324 F.3d 1346, 1352 (Fed. Cir. 2003).  In pertinent part Rule 59 states that "the court may, on motion, grant a new trial . . . on all or some of the issues . . . to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A). In <u>Jones</u>, 324 F.3d at 1352, the Federal Circuit held that regional circuit law applies to the procedural aspects of motions for new trial.  In this circuit a new trial may be granted under Rule 59(a) if the court finds that "the verdict is against the weight of the evidence, . . . the trial was unfair, or prejudicial error was committed in its course."  <u>Wellogix, Inc. v. Accenture, L.L.P.</u>, 716 F.3d 867, 881 (5th Cir. 2013), <u>cert. denied</u>, 134 S. Ct. 2725 (2014) (quoting <u>Smith v. Transworld Drilling Co.</u>, 773 F.2d 610, 613 (5th Cir. 1985)).

> In making this determination, the district court weighs all the evidence, but need not view it in the light most favorable to the nonmoving party.  While the court is to respect the jury's collective wisdom and must not simply substitute its opinion for the jury's, "[i]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial."

<u>Smith</u>, 773 F.2d at 613 (citation omitted).  The Fifth Circuit has explained that "[a] new trial will not be granted based on trial error unless, after considering the record as a whole, the court

concludes that manifest injustice will result from letting the verdict stand." Learmonth v. Sears, Roebuck and Co., 631 F.3d 724, 731 (5th Cir. 2011). "[T]he burden of showing harmful error rests on the party seeking the new trial." Sibley v. Lemaire, 184 F.3d 481, 487 (5th Cir. 1999), cert. denied, 120 S. Ct. 1420 (2000) (quoting Del Rio Distributing, Inc. v. Adolph Coors, Co., 589 F.2d 176, 179 n. 3 (5th Cir.), cert. denied, 100 S. Ct. 80 (1979).

## III. __Analysis__

Asserting that the jury's verdict of no infringement is against the great weight of the evidence, Magēmā argues that a new trial is warranted because Defendants (1) repeatedly contradicted the court's claim construction order, (2) argued limitations that are not found in the claims, (3) violated the court's order excluding inadmissible evidence, (4) introduced legal error by improperly comparing its refinery processes to the Rigby Process; and (5) engaged in trial tactics that misled the jury.[12] Defendants respond that a new trial is not warranted for any of these asserted reasons because Magēmā failed to raise most of them at trial, and because all of them are meritless.[13]

---

[12]Magēmā's MNT, Docket Entry No. 292, p. 2.

[13]Defendants' Response to Magēmā's MNT, Docket Entry No. 293, p. 6.

-7-

## A.    Defendants Did Not Contradict the Claim Construction Order

Citing the testimony of Dennis Vauk ("Vauk") and Dr. Edward Sughrue ("Dr. Sughrue"), Magēmā argues that a new trial is warranted because these defense witnesses repeatedly undermined and contradicted the court's construction of "HMFO."[14]  In support of this argument Magēmā cites Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1321 (Fed. Cir. 2009), for holding that "[n]o party may contradict the court's construction to a jury,"[15] and Cytologix Corp. v. Ventana Medical Systems, Inc., 424 F.3d 1168, 1172 (Fed. Cir. 2005), for holding that "expert testimony at trial 'opin[ing] on claim construction before the jury' and counsel's 'argu[ing] conflicting claim constructions to the jury' were 'improper' due to the high 'risk of confusing the jury.'"[16]  Magēmā argues that Defendants'

> trial presentation flouted the Court's construction and sought to back-door its previously-rejected construction to the jury through other improper comparisons.  This is prejudicial error due to the high degree of risk that it misled the jury to improperly find non-infringement based not on the Court's construction, but on [Defendants'] construction.[17]

---

[14]Magēmā's MNT, Docket Entry No. 292, pp. 11-13.  See also Magēmā's Reply, Docket Entry No. 294, pp. 8-9.

[15]Id. at 11.

[16]Id. at 13.

[17]Id.

Defendants respond that no new trial is warranted on this basis because "[n]either of the witnesses' challenged testimony drew any objection from Magēmā,"[18] and because neither witness contradicted the court's claim construction order.[19]

The court's claim construction order construed the term "HMFO" to mean "a petroleum product fuel compliant with the ISO 8217:2017 standards for the bulk properties of residual marine fuels except for the concentration levels of the Environmental Contaminates."[20] The court's construction favored one of Magēmā's proposals and rejected Defendants' proposals, which sought to define "HMFO" based on the presence of "process residue that has not boiled or vaporized even at vacuum conditions."[21]

Magēmā complains that despite stating at docket call "we're <u>not</u> going to be making arguments that because what is being hydrotreated at Bayway is <u>lacking a residue</u>, that that's a reason to avoid infringement,"[22] Vauk, Phillips 66's director of hydroprocessing technology,[23] testified that the patent claims

---

[18]Defendants' Response to Magēmā's MNT, Docket Entry No. 293, p. 8.

[19]<u>Id.</u> at 9-10.

[20]Memorandum Opinion and Order, Docket Entry No. 50, pp. 17, 38.

[21]<u>Id.</u> at 12.

[22]Magēmā's MNT, Docket Entry No. 292, p. 11 (quoting Transcript of Docket Call Proceedings, Docket Entry No. 216, p. 18:10-13).

[23]Trial Transcript Day 2, Docket Entry No. 285, p. 2-166:23-25.

require a residue.  Magēmā's MNT quotes only a few lines of Vauk's testimony.[24]  But when read together with the lines immediately before and after the quoted lines, Vauk's testimony is clearly an expression of his personal opinion solicited by Magēmā's counsel, and is not testimony that either undermined or contradicted the court's construction of "HMFO":

> MS. JONES: Could we pull up the '884 patent Claim 1, please.
>
> **BY MS. JONES:**
>
> Q.   And so you'll see that Claim 1 requires an ISO 8217 material that is merchantable quality as a residual marine fuel oil and if you look at ISO 8217, the table that defines what a residual marine fuel oil is is Table 2, right?
>
> A.   That's correct.
>
> Q.   Okay.  So that's what we're talking about when we're talking about the patent claims?
>
> A.   What I'm reading here is a low-sulfur heavy marine fuel oil and what your patent defines [as] a low-sulfur heavy marine fuel oil is a residue that has a minimum asphaltene content.
>
> Q.   Okay.   But that's not the Court's claim construction of a heavy marine fuel oil, is it?
>
> A.   I'm not the patent expert and I don't — I haven't been well informed about what the Court's construction claims are.
>
> Q.   Yes. . . . so I will read it for you. . . So the Court construed heavy marine fuel oil not to require any process residues or any specific materials.  Do you understand that?

---

[24]Magēmā's MNT, Docket Entry No. 292, p. 11 (quoting Trial Transcript Day 3, Docket Entry No. 286, p. 3-10:1-9).

A.    No, I don't understand that.

Q.    So let me tell you what the construction is here.
      It's a petroleum product fuel compliant with ISO
      8217 standard for bulk properties of residual
      marine fuels except for the concentration levels of
      environmental contaminants.

      And so the Court says that heavy marine fuel oil
      doesn't mean whatever ingredients that you're
      referring to, Mr. Vauk.  It means what's compliant
      with ISO 8217, okay?

      So, for purposes of today when I talk about a heavy
      marine fuel oil or a residual marine fuel oil,
      that's what I'm talking about.  Do you understand
      that?

A.    I understand that's what you're saying, but I don't
      agree with what you're saying.

Q.    I understand that you don't agree with the Court's
      claim construction.  But we're here to talk about
      the patents and that's the claim construction that
      applies to [the] patents; is that fair?

A.    ISO 8217 gives a definition of what a residual fuel
      oil is and it says in the — it says that a residual
      fuel oil has to contain — it says all residual fuel
      oils contain metals and that's in the ISO 8217
      specification.

Q.    Okay.    I  understand  you  disagree  with  the
      construction.  Let's move on . . .[25]

The  Vauk  testimony  about  which  Magēmā  complains  is  an
expression  of  Vauk's  personal  opinion  solicited  by  Magēmā's
counsel; it is neither an expression of Defendants' position nor an
attempt  by  Defendants  to  undermine  or  contradict  the  court's
construction of "HMFO."   Accordingly, the court concludes that

---

[25]Trial Transcript Day 3, Docket Entry No. 286, pp. 3-9:18 -
11:14.

Vauk's testimony does not warrant a new trial because it did not contradict the court's claim construction order.

Quoting only a few lines of Dr. Sughrue's testimony, Magēmā implies that he contradicted the court's claim construction order by telling "the jury that a 'distillate' cannot meet ISO 8217 Table 2" by virtue of its being a distillate.[26] But that is not what Dr. Sughrue testified.   To the contrary, Dr. Sughrue's testimony acknowledged both the court's construction of "HMFO," and his obligation to adhere to that construction:

> Q.    Now, if something is a distillate, it could also be infringing; isn't that right?
>
> A.    We're getting into some area that I'm uncomfortable with.  But I have to go with the Court's — I don't feel a distillate will meet Table 2 specifications because the CCAI cannot be applied to a distillate low-viscosity.  It's outside the range of that correlation, so you're now misapplying that correlation.
>
> Q.    Are you saying, sir, that you have not applied this Court's construction, then?
>
> A.    I have used the Court's construction.
>
> Q.    So I'm asking you: Under this Court's construction, if you had a distillate and it was ISO 8217 compliant, would it be infringing?
>
> A.    I'll say it this time: Yes.[27]

Dr. Sughrue's testimony does not warrant a new trial because it neither undermined nor contradicted the court's claim construction.

---

[26]Magēmā's MNT, Docket Entry No. 292, p. 12 (quoting Trial Transcript Day 5, Docket Entry No. 288, p. 5-160:9-16).

[27]Trial Transcript Day 5, Docket Entry No. 288, p. 5-160:9-23.

**B.    Defendants Did Not Argue Limitations Not Found in the Claims**

Asserting that Defendants' "primary tactic was to manufacture additional claim 'requirements' necessary to prove infringement, but which were not based on the actual claim language,"[28] Magēmā argues that Defendants' "improper additional requirements included: actual testing; a feed compliant 'before it hits any of the equipment' (outside the battery limits); and a minimum viscosity."[29] Acknowledging that "the Court's jury charge properly identified the focus as a comparison between the claim language as construed and the accused products,"[30] Magēmā argues that "the prejudicial errors [Defendants] introduced through [these] additional requirements were not cured."[31]   Magēmā argues that each of these improper requirements was designed to hinder its ability to prove infringement at the Bayway refinery.[32]

Defendants respond that no new trial is warranted on this basis because Magēmā failed to object at trial to all but one of these arguments, and because Magēmā's challenges rest on claim limitations that were not subject to court claim construction.[33]

---

[28]Magēmā's MNT, Docket Entry No. 292, p. 6.

[29]Id.

[30]Id.

[31]Id.

[32]Id. at 13-17.   See also   Magēmā's Reply, Docket Entry No. 294, pp. 5-6.

[33]Defendants' Response to Magēmā's MNT, Docket Entry No. 293,
(continued...)

Absent the court's construction of a claim term, the jury was free to rely on the term's plain and ordinary meaning.  See ePlus, Inc. v. Lawson Software, Inc., 700 F.3d 509, 520 (Fed. 2012).

      1.    Defendants' Minimum Viscosity Arguments were Relevant to the Claim Limitation "Of Merchantable Quality as a Residual Marine Fuel Oil" in Claim 1 of the '884 Patent

Citing the testimony of Romulo Monsalve ("Monsalve"), Phillips 66's manager of commercial fuel trading, Magēmā asserts that Defendants "repeatedly told the jury that the Bayway feed and product could not be sold as a 'residual marine fuel' because its viscosity is too low."[34]  Asserting that "there is no such requirement found in the actual claim language or in this Court's instructions [because n]othing in the claims or in ISO 8217 Table 2 imposes a minimum viscosity,"[35] and that Monsalve's testimony was based on requirements set for the Platts trading market, which did not exist for HMFO with 0.5% sulfur when the original patent was filed,[36] Magēmā argues that "[t]he claims cannot include a minimum

_____

[33](...continued)
pp. 10-12.

    [34]Magēmā's MNT, Docket Entry No. 292, p. 16 (citing Trial Transcript Day 5, Docket Entry No. 288, p. 5-91:7-17).  See also Trial Transcript Day 5, Docket Entry No. 288, pp. 5-81:1-4, and 5-95:9-11 (identifying Monsalve).

    [35]Id. at 17.

    [36]Id. at 16 (citing Trial Transcript Day 5, Docket Entry No. 288, pp. 5-91:20-92:4, and 5-99:7-21).

viscosity 'requirement' based on [a] trading market that did not exist at the time of the invention."[37]  Defendants respond that Claim 1 of the '884 Patent requires HMFO to be "of merchantable quality as a residual marine fuel oil," and that neither party asked the court to construe that term.  Defendants argue that just because "Magēmā had [no] competing evidence about the . . . viscosity window for merchantability is no sign of error."[38]

> Claim 1 of the '884 Patent contains a limitation stating that
>
> prior to hydroprocessing the high sulfur heavy marine fuel oil is compliant with ISO 8217:2017 and **is of merchantable quality as a residual marine fuel oil** but has a sulfur content (ISO 14596 or ISO 8754) greater than 0.5% wt. and wherein the low sulfur heavy marine fuel oil is compliant with ISO 8217:2017 and **is of merchantable quality as a residual marine fuel oil** and has a sulfur content (ISO 14596 or ISO 8754) less than 0.5% wt.[39]

The Joint Pretrial Order states that Defendants contend "[t]he [Bayway] DSU-1 feed and product are not of 'merchantable quality as a residual marine fuel oil' because of low viscosity."[40]  Whether this limitation was satisfied by feed to the Bayway hydrotreater was therefore a disputed issue of fact for the jury to decide. Because neither party asked the court to construe "of merchantable

---

[37]Id. at 17.

[38]Defendants' Response to Magēmā's MNT, Docket Entry No. 293, p. 12.

[39]'884 Patent, Exhibit 1 to Plaintiff's Complaint, Docket Entry No. 1-1, p. 18 (emphasis added).

[40]Joint Proposed Pretrial Order, Docket Entry No. 209, p. 12.

quality as a residual marine fuel," the jury was to apply the
term's plain and ordinary meaning when determining whether this
limitation was satisfied.  ePlus, 700 F.3d at 520.

Three witnesses testified about this claim limitation.  The
first two were Magēmā's witnesses: Moore, one of the patents' two
named inventors; and Dr. James Speight ("Dr. Speight"), Magēmā's
expert.[41]  Moore testified that the patented fuel oil had to be
merchantable, i.e., salable, and that there was an annex associated
with the specification for marine fuels that mentions deleterious
materials, which he described as "things that can react and fall
out of solution or cause a ship to shut down."[42]  Dr. Speight
testified that "[w]hen a product is sold, it should not have . . .
any deleterious materials.  And those — the materials are usually
defined . . . as influencing the performance of the product for the
service which it is intended."[43]  Dr. Speight also testified that
when reviewing the Bayway feed he found no deleterious materials
other than sulfur, which would be removed by hydrotreating.[44]

_____

[41]Magēmā's MNT, Docket Entry No. 292, p. 27 (citing Trial
Transcript Day 2, Docket Entry No. 285, p. 2-11:7-11 (Moore
testimony); Trial Transcript Day 4, Docket Entry No. 287, pp. 4-
50:7-51:23 (Dr. Speight testimony); and Trial Transcript Day 5,
Docket Entry No. 288, p. 5-99:7-21 (Monsalve testimony)).

[42]Trial Transcript Day 2, Docket Entry No. 285, p. 2-11:5-10.

[43]Trial Transcript Day 4, Docket Entry No. 287, p. 4-51:1-5.

[44]Id. at lines 6-23.

The only defense witness who testified about this claim limitation was Monsalve, Phillips 66's manager of commercial fuel trading.  Monsalve testified that Bayway feed could not be sold as a residual marine fuel oil because its viscosity was too low.[45]  He did not testify that Bayway product could not be sold for that reason.  To the contrary, Monsalve testified that he could and did sell Bayway product as residual marine fuel oil that complied with ISO 8217:2017.[46]  He testified that the Platts window, a platform used by buy and sell marine fuel oil, requires viscosity to be no less than 30 centistokes, and that viscosity of the Bayway feed was in the single digits.  He testified that while the Platts window applies in the New York Harbor and elsewhere in the Northeast, that even outside that area "most ship owners would have issues running residual fuel oil with viscosity in the single digits . . . [a]nd some of them will actually ask you for a minimum [viscosity],"[47] because fuel oil of low viscosity would require them "to treat the engines all the time, . . . [a]nd if they don't, they could have engine failure."[48]  From Monsalve's uncontradicted testimony the jury could reasonably have concluded not only that viscosity is relevant to the claim limitation that required both the Bayway feed

_____

[45]Trial Transcript Day 5, Docket Entry No. 288, pp. 5-91:12-19, 5-94:11-13.

[46]Id. at 5-95:9-96:23.

[47]Id. at 5-92:18-21.

[48]Id. at 5-92:25-93:2.

and product to be "of merchantable quality as a residual marine fuel," but also that the Bayway feed could not be sold as a residual marine fuel oil because its viscosity was too low.

Because Claim 1 of the '884 Patent includes a claim limitation "of merchantable quality as a residual marine fuel," because Defendants contended that neither the feed nor product of the Bayway DSU-1 hydrotreater met this limitation, and because Monsalve testified without contradiction that Bayway feed could not be sold as a residual marine fuel oil because its viscosity was too low, the court concludes that Defendants did not argue a limitation not found in the claims when they told the jury that the Bayway feed could not be sold as a residual marine fuel because its viscosity is too low.

       2.   Defendants' Arguments Regarding "A Feed Compliant 'Before It Hits Any of the Equipment' (Outside the Battery Limits)" were Relevant to the Claim Limitation of "Prior to Hydroprocessing" in Claims 1 and 5 of the '884 Patent

Asserting that "neither Claim 1 nor Claim 5 of the '884 Patent even use the word 'feed' or 'feedstock,'"[49] and that Defendants' counsel repeatedly told the jury during closing argument that: "The feedstock has to be compliant before it hits any of the equipment,"[50] Magēmā argues that Defendants' statement to the jury

---

     [49]Magēmā's MNT, Docket Entry No. 292, p. 15.

     [50]Id. (citing Trial Transcript Day 6, Docket Entry No. 289, pp. 6-100:3-4 and 6-103:3-4).

that "Magēmā had to prove that the feed was compliant with ISO 8217
'before it hits any of the equipment' in order to establish
infringement was prejudicial error and resulted in a verdict that
is against the great weight of the evidence."[51]  Asserting that the
'884 Patent's claims require compliance with ISO 8217:2017 "prior
to hydroprocessing," and that no party requested construction of
that term "prior to hydroprocessing," Defendants respond that they
were free to introduce — and the jury was free to weigh — evidence
and argument relevant to whether that limitation was satisfied.[52]

Both Claims 1 and 5 of the '884 Patent contain a limitation
stating that "**prior to hydroprocessing** the high sulfur heavy marine
fuel oil is compliant with ISO 8217:2017."[53]  Although no party
sought the court's construction of the term "prior to
hydroprocessing," the parties vigorously disputed where, i.e., at
what location or place in the process, compliance with this
limitation should be determined at the Bayway refinery.  Magēmā
contended that the correct place to determine compliance with this
limitation was after, i.e., downstream from Drum D-101 where there
was no sampling station.[54]  In contrast, Defendants contended that

---

[51]Id. at 16 (citing Trial Transcript Day 6, Docket Entry
No. 289, p. 6-100:3-4).

[52]Defendants' Response to Magēmā's MNT, Docket Entry No. 293,
pp. 10-11.

[53]'884 Patent, Exhibit 1 to Plaintiff's Complaint, Docket Entry
No. 1-1, p. 18 (emphasis added).

[54]See Magēmā's MNT, Docket Entry No. 292, p. 27.

the correct place to determine compliance with this limitation was at a long-established sampling station located before the material to be processed hit any of the hydrotreating equipment, _i.e.,_ outside the battery limits, upstream from Drum D-101.[55]   At trial the parties presented conflicting evidence on this issue.

Magēmā's expert on hydroprocessing and analysis of operational data and physical properties, Dr. Peter Loezos ("Dr. Loezos"),[56] testified that the correct place to determine compliance with the limitation stating that "**prior to hydroprocessing** the high sulfur heavy marine fuel oil is compliant with ISO 8217:2017," was "at the point where no further material is added or removed,"[57]   _i.e.,_ not upstream but, instead, downstream of Drum D-101.[58] Magēmā's expert, Dr. Speight, similarly testified that the correct place to measure physical properties of the Bayway feedstock was after the feed surge drum, _i.e.,_ Drum D-101, just before it entered the heater to

---

[55]Defendants' Response to Magēmā's MNT, Docket Entry No. 293, p. 22 (asserting that "the jury rejected Magēmā's argument that the hydroprocessor is delineated by the reactor rather than by the battery limits;" and citing the testimony of Phillips 66 employee Frank Tracy that "battery limits" means "everything inside of [a] geographical space," Trial Transcript Day 5, Docket Entry No. 288, pp. 5-53:23-54:6).

[56]Trial Transcript Day 3, Docket Entry No. 286, p. 3-170:9-12 (identifying Dr. Loezos as an expert).

[57]Id. at 3-211:25-212:1.

[58]Id. at 3-189:2-9.

the reactor.[59]  However, Dr. Speight's testimony on this issue was impeached during cross-examination when he agreed with defense counsel that his trial testimony conflicted with (1) Figure 2 of the '884 Patent showing that the first material is compliant with ISO 8217 before it hits any equipment;[60] and (2) with the description of a hydrotreater in his book, Handbook of Petroleum Refining published in 2017.[61]

In contrast, Defendants' expert, Dr. Sughrue, testified that the correct place to determine whether the limitation "**prior to hydroprocessing** the high sulfur heavy marine fuel oil is compliant with ISO 8217:2017," is satisfied is before the unprocessed material goes into any of the equipment, i.e., before unprocessed material is mixed with recycled material also referred to as outside the battery limits.[62]

---

[59]Trial Transcript Day 4, Docket Entry No. 287, pp. 4-29:4-32:2.  See also id. at 4-126:7-10 ("Q. Your opinions for flash point depend on picking a point for compliance somewhere around the furnace of the DSU-1 hydrotreator, correct?  A. Just upstream of the furnace, yes.").; id. at 4-126:20-24 ("Q. With respect to DSU-1 and the flash, your opinion is compliance is determined somewhere in the middle, correct?  Around the furnace.  A. . . .[Y]es, around the upstream of the furnace, yes.").

[60]Id. at 4-120:1-24.  See also id. at 4-121:5-11 ("Q.  But the figure's telling us it has to be compliant before it hits any of the equipment, correct?  A. Yes.  Q.  Is there any text in the patent that tells you you should look for compliance, not here . . . but somewhere in the middle? A. No.").

[61]Id. at 4-122:25-126:6.

[62]Trial Transcript Day 5, Docket Entry No. 288, pp. 5-114:18-115:1.

Because the parties vigorously disputed where, i.e., at what location or place in the process compliance with the limitation "**prior to hydroprocessing** the high sulfur heavy marine fuel oil is compliant with ISO 8217:2017," had to be determined, and because the parties presented conflicting evidence on this issue, including evidence from Magēmā's expert, Dr. Speight, who testified that Figure 2 of the '884 Patent shows the unprocessed material is compliant with IS) 8217:2017 before it hit any of the equipment, the court is not persuaded that Defendants argued a limitation not found in the claims by arguing that the claims require a feed compliant before it hits any of the equipment.

3.   Defendants' Arguments Regarding "Actual Testing Data" were Relevant to the Claim Limitation of "Compliant with 8217:2017" in Claims 1 and 5 of the '884 Patent, but also Improper and Prejudicial to Magēmā

Magēmā argues that Defendants improperly argued to the jury that testing of actual samples was needed to prove infringement.[63] Asserting that Defendants "repeatedly argued that testing of an actual sample was 'required' [to prove compliance with ISO 8217],"[64] and that "[t]his argument was re-iterated throughout trial and . . . in closing arguments,"[65] Magēmā argues that Defendants' fabricated

---

[63]Magēmā's MNT, Docket Entry No. 292, p. 6.

[64]Id. at 14.

[65]Id.

this requirement for purposes of concocting a non-infringement argument.[66]

Asserting that Claims 1 and 5 of the '884 Patent contain the limitation "compliant with ISO 8217:2017," and that no party requested construction of that limitation, Defendants respond that they were free to introduce — and the jury was free to weigh — evidence and argument relevant to deciding if that limitation was satisfied.[67]  Defendants argue that "Magēmā offered its version of what it believed satisfied compliance with ISO 8217 in the form of Riazi estimates, but there is no error for the jury to consider alternate explanations for compliance based on the language contained in the ISO 8217 standard itself."[68]

Both Claims 1 and 5 of the '884 Patent contain a limitation stating that "prior to hydroprocessing the high sulfur heavy marine fuel oil is **compliant with ISO 8217:2017.**"[69]  No party sought the court's construction of "compliant with ISO 8217:2017," and the claims are silent as to how compliance with ISO 8217:2017 is to be

---

[66]Id. at 15. See also Magēmā's Reply, Docket Entry No. 294, p. 6 ("Magēmā repeatedly objected to the introduction of the 'actual testing' requirement from the very first day of trial)(citing Trial Transcript Day 1, Docket Entry No. 284, pp. 1-5:3-7:21)).

[67]Defendants' Response to Magēmā's MNT, Docket Entry No. 293, pp. 10-12.

[68]Id. at 12.

[69]'884 Patent, Exhibit 1 to Plaintiff's Complaint, Docket Entry No. 1-1, p. 18 (emphasis added).

determined.   At  trial,  Magēmā  presented  evidence  showing  that
Defendants  did  not  have  a  sampling  station  at  the  place  where  it
argued  compliance  with  ISO  8217  should  be  determined  at  the  Bayway
refinery,  i.e.,  after  or  downstream  from  Drum  D-101  and,  therefore,
that  it  relied  on  estimates  of  flash  point  calculated  by  applying
the  Riazi  Formula  to  otherwise  available  data.   In  contrast,
Defendants  presented  evidence  showing  that  Magēmā's  reliance  on  the
Riazi  Formula  to  show  compliance  with  ISO  8217  was  improper  because
the  ISO  standards  require  compliance  to  be  shown  by  tests  performed
on  actual  samples.   Because  the  parties  disputed  how  the  limitation
"**compliant  with  ISO  8217:2017**"  had  to  be  determined,  and  because
Defendants  presented  evidence  that  the  ISO  standards  required
testing  of  actual  samples,  the  court  is  not  persuaded  that
Defendants  argued  a  limitation  not  found  in  the  claims  when  they
argued  that  testing  of  actual  samples  was  needed  to  prove
infringement.

Nevertheless,  because  the  court  denied  Magēmā's  motion  to
compel  production  of  actual  samples  from  the  place  it  argued
compliance  should  be  determined  based,  in  part,  on  Defendants'
assertions  that  Magēmā  did  not  need  actual  samples  to  prove  its
allegations  of  infringement,[70]  Defendant's  argument  that  testing  of

_____

[70]See  Transcript  of  November  4,  2021,  Motion  Hearing,  Docket
Entry  No.  68,  pp.  10:16-11:24.   See  also  id.  at  25:15-19  (Defense
counsel  stated  that  "[t]here  are  a  lot  of  different  ways  to  try  to
get  to  the  estimates  of  combining  these  streams").   See  also
(continued...)

actual samples was needed to prove infringement was improper and prejudicial to Magēmā.  The court recognized this during the fifth day of trial when hearing argument for and against Magēmā's motion for a curative instruction that estimate calculations are a sufficient substitute for test data when actual samples could not be obtained from the location at issue:[71]

> MS. JONES: They're arguing that even if we show Riazi is 100 per cent reliable, that it will never meet the ISO 8217 standard because it's, per se, insufficient.
>
> THE COURT: Are you arguing that?
>
> MR. WALKER: Well, we're arguing that the estimation is wrong, but we're also arguing that the standard requires you to use a test rather than any estimations and that goes to the weight as to whether or not that they can use estimations.
>
> THE COURT: Yeah, but the problem is you didn't produce tests or provide a test method that could be used by Magēmā before the discovery cutoff.  So how in the world could they possibly satisfy what you say is their burden?
>
> MR. WALKER: At that point in time, they were focused on the prediction of the Riazi method, which we've covered in the last few days, was predicting it before the Drum D-101.  It's only as this theory evolved that it said that it was after Drum D-101 —
>
> THE COURT: Yeah, but as my opinion goes into excruciating detail, they raised that issue well before the discovery cutoff.

---

[70] (...continued)
Memorandum Opinion and Order, Docket Entry No. 204, pp. 69-72.

[71] See Plaintiff Magēmā Technology LLC's Motion for Curative Instruction Regarding Magēmā's Use of Estimate Calculations, Docket Entry No. 245, and Proposed Order attached thereto, Docket Entry No. 245-1.

MR. WALKER: I understand.  That was not our interpretation of what they were saying at the time.

THE COURT: All right.  I'm going to think about this, but I'm not inclined — what relief do you want before I say what I'm not inclined to do?

MS. JONES: I would like some instruction that estimations are permitted under the standard, especially when samples are not available, whatever, you know, wording is appropriate there.  But I think that that way they can challenge the reliability of the estimations, but not whether or not we could —

THE COURT: Why can't you argue that the preferred method is testing, but there was no testing at that location so we used Riazi?

And then why can't you say, "That may be true, but Riazi is not good.  It's not credible?"

MR. WALKER: That's fine with us.

THE COURT.  Okay.  That solves the problem.[72]

Following the above quoted exchange with counsel, the court denied Magēmā's motion for curative instruction, but warned the parties, "I'll be attuned [to any] attempt from any creative lawyer to get around my ruling during final argument, and I won't be reluctant to take appropriate action."[73]  But as Magēmā notes, "[d]espite the warning, Defendants' counsel and final witness, [John] Allen [("Allen")], made no less than 5 references to 'actual' or 'required' or 'right' test methods or lab data on Day 6 of the trial."[74]  Although Magēmā did not object to these

---

[72]Trial Transcript Day 5, Docket Entry No. 288, pp. 5-241:11-242:23.

[73]Id. at 5-243:6-9.

[74]Magēmā's MNT, Docket Entry No. 292, p. 15 n. 5 (citing Trial
(continued...)

references made on the sixth day of trial, Magēmā objected to Defendants' argument that "compliant with ISO 8217:2017" could only be shown by testing of actual samples throughout the course of this litigation.[75]   Accordingly, the court concludes that Defendants' arguments regarding "actual testing data" were relevant to the claim limitation of "compliant with 8217:2017" in Claims 1 and 5 of the '884 Patent, but also improper and prejudicial to Magēmā because in response to Magēmā's motion to compel actual samples,

---

[74](...continued)
Transcript Day 6, Docket Entry No. 289, pp. 6-26:18 (Allen testimony), and 6-29:3-31:12, 6-97:3-5, 6-98:23, 6-106:10-13, and 6-108:12-15 (closing argument)). The cited line from the Allen testimony is likely a typographical error because there is no mention of testing at p. 6-26:18. Allen's reference to "actual lab data" is found at p. 6-29:18 during questioning about flash point in Drum D-101, which ran from p. 6-29:3 to 6-31:12.  The lines cited from Defendants' closing argument all referenced testing of actual samples from the Bayway refinery that Defendants argued were either needed to prove infringement, e.g., p. 6-97:3-5 ("We know what those required specifications and required test methods are because they are in Defendants' Exhibit 10." (See Defendants' Trial Exhibit 10, Docket Entry No. 267-3 (International Standard ISO 8217 Sixth Edition 2017-03: Petroleum Products — Fuels (class F) — Specifications of marine fuels)); p. 6-98:23 ("The actual test data of the feed at Bayway."); 6-106:10-13 ("It's not the right test. And look again at 8217.  It's not in the books.  It's not in 8217. They haven't proved the case."); and 6-108:12-15 ("But folks, you don't get to Question 3 or Question 4 when you answer 'no' to Questions 1 and 2.  And you answer 'no' because that's consistent with there's no actual test data that shows compliance, none.  And these estimates are not reliable; they're not at the right place; and they certainly haven't proven anything.").

[75]Id. at 15. See also Magēmā's Reply, Docket Entry No. 294, p. 6 ("Magēmā repeatedly objected to the introduction of the 'actual testing' requirement from the very first day of trial)(citing Trial Transcript Day 1, Docket Entry No. 284, pp. 1-5:3-7:21)).

Defendants argued that Magēmā did not need actual samples and could, instead, prove infringement with estimates calculated from otherwise available data.[76]

Nevertheless, the court is not persuaded that the prejudice caused by Defendants' argument regarding testing of actual samples warrants a new trial because Magēmā has not shown that that argument affected the outcome of the trial, and after considering the record as a whole, the court concludes that that argument did not affect the outcome of the trial. The court reaches this conclusion because Defendants' argument regarding the need for testing of actual samples to prove infringement could only have affected the outcome of the trial if the jury determined that the Bayway feed satisfied the limitation of merchantability, and that that the correct place to determine compliance with the limitation "**prior to hydroprocessing** the high sulfur heavy marine fuel oil is compliant with ISO 8217:2017," was, as Magēmā argued, downstream of Drum D-101, and not as Defendants argued, before unprocessed material hit any of the equipment, i.e., outside the battery limits or upstream of Drum D-101. However, because as discussed in § III.B.1, above, Defendants presented undisputed evidence that the Bayway feed was not merchantable because its viscosity was too low,

---

[76]See Transcript of November 4, 2021, Motion Hearing, Docket Entry No. 68, pp. 10:16-11:24. See also id. at 25:15-19 (Defense counsel stated that "[t]here are a lot of different ways to try to get to the estimates of combining these streams"). See also Memorandum Opinion and Order, Docket Entry No. 204, pp. 69-72.

and as discussed in § III.B.2, above, Dr. Speight's trial testimony regarding the correct place to determine the Bayway feedstock's compliance with ISO 8217 was impeached during cross examination, the court is not persuaded that the jury's unanimous verdict of no infringement is either against the great weight of the evidence or manifestly unjust.

## C.   Defendants Did Not Violate the Court's Exclusionary Order

Citing the following testimony of its CEO, Klussmannn, Magēmā argues that Defendants "brazenly referred to excluded evidence before the jury."[77]

> [A.   .  .  .  And I believe that when you talk about specific testing listed in the standard, if it's not possible, or if samples of the materials that have gone through this pretreatment are provided, then it is appropriate to use calculations to determine those values.
>
> Q.   That's not what your patent says, does it? It doesn't say anything about if samples are not available.
>
> A.   It's not in the patent, but the assumption is that the correct samples would be available for testing.]
>
> Q.   And it's not in ISO 8217, is it?
>
> A.   It's not, but again, it's assumed that the fuel tested would be physically available, the correct materials to be tested.
>
> Q.   And [Defendants] provided you and offered to provide you with samples, didn't [they], in this lawsuit?

---

[77]Magēmā's MNT, Docket Entry No. 292, p. 17.

A.   They didn't provide the correct samples.

Q.   They offered to, didn't they?

A.   They didn't provide the correct samples.

Q.   They offered to didn't they?

A.   After close of discovery and changes to operation is my understanding of —

[MR. LEE: Your Honor, at this point, I object.  Mr. Brown is talking about stuff that came along –

THE COURT: All right.  Move along, Mr. Brown.][78]

Magēmā argues that this questioning

was highly prejudicial error and created the false appearance to the jury that [Defendants] had <u>all along</u> offered Magēmā the requested samples.  As this Court knows, however, Magēmā moved to compel those samples, but was denied.  Only after summary judgment briefing was complete and [Defendants] perceived a risk that the burden of proving infringement may shift to them as a result of Magēmā's 35 U.S.C. § 295 motion, did [they] belatedly proffer the requested samples, and for the Bayway refinery <u>only</u>.

Magēmā requested a curative instruction in connection with [Defendants'] reference to the excluded evidence and the related "actual testing" argument, which this Court denied.  Ex. E, Day 5 Tr. at 5-243:1-9.  In denying the curative instruction, the Court may have been under the mistaken impression that Magēmā's counsel had elicited testimony related to the production of the excluded Bayway samples.  <u>Id.</u> at 5-236:19-237:8.  The testimony that Magēmā believes the Court was referring to at the time was related to the Wood River refinery.  Ex. C, Day 3 Tr. at 3-34:12-35:2.  There is no dispute that [Defendants] <u>never</u> (even <u>belatedly</u>) offered samples from the requested sample point for the Wood River Refinery.[79]

---

[78] <u>Id.</u> (quoting Trial Transcript Day 3, Docket Entry No. 286, p. 3-140:11-22).

[79] <u>Id.</u> at 18.

Although Magēmā fails to identify either the exclusionary
order referenced or the evidence excluded, both the quoted
testimony and the reference to Magēmā's request for a curative
instruction make clear that the reference is to the court's ruling
at Docket Call that "newly developed D-101 samples will not be
admissible for any reason including liability or willfulness."[80]
The "newly developed D-101 samples" are samples that Defendants
took from sample stations established at the Bayway refinery in
September of 2022 after discovery had closed, with which they
sought to supplement their response to Magēmā's Motion for Partial
Summary Judgment.[81]  But for the reasons explained in the January
19, 2023, Memorandum Opinion and Order, the court denied
Defendants' motion to supplement.[82]

The questioning that Magēmā challenges as "brazenly
referr[ing] to excluded evidence before the jury,"[83] is questioning
related to the Wood River refinery and not the Bayway refinery

---

[80]Transcript of Docket Call Proceedings, Docket Entry No. 216,
p. 8:5-7.

[81]See Defendants' Request for Leave to Supplement Its Response
to Magēmā's Motion for Partial Summary Judgment of Infringement,
Docket Entry No. 198; Magēmā's Opposition to Defendants' Motion for
Leave to Supplement Its Response (ECF No. 198), Docket Entry
No. 199; and Defendants' Reply in Support of Its Request for Leave
to Supplement Its Response to Magēmā's Motion for Partial Summary
Judgment of Infringement, Docket Entry No. 200.

[82]See Memorandum Opinion and Order, Docket Entry No. 204,
pp. 18-32.

[83]Magēmā's MNT, Docket Entry No. 292, p. 17.

where the excluded samples originated.  As Defendants observe, the
relation to the Wood River refinery

> is made plain by the immediately preceding context
> relating to samples for CCAI testing.  Discussions about
> CCAI focused exclusively on Wood River and did not relate
> to the Court's exclusion of Bayway flash point evidence
> at all.[84]

Accordingly, the court concludes that the questioning about which
Magēmā complains did not violate the court's exclusionary order.

## D.   Defendants Did Not Introduce Legal Error by Comparing its Refinery Processes to the Rigby Process

Magēmā argues that Defendants introduced legal error by
"improperly compar[ing] its processes to a single commercial
embodiment of the patented invention referred to as the Rigby
Process."[85]  Citing inter alia Myco Industries, Inc. v. BlephEx,
LLC, 955 F.3d 1, 15 (Fed. Cir. 2020), for stating that "[t]he law
is clear . . . infringement is determined on the basis of the
claims, not on the basis of a comparison with the patentee's
commercial embodiment of the claimed invention,"[86] Magēmā argues
that "[c]omparison of [Defendants'] accused processes to the
single, narrower commercial embodiment of the Rigby Process misled
the jury into believing that the claims were narrower in scope than

---

[84]Defendants' Response to Magēmā's MNT, Docket Entry No. 293,
p. 14.  See also id. n. 12 (citing Trial Transcript Day 3, Docket
Entry No. 286, pp. 3-139:20-140:10 and stating: "Counsel asking
whether a feed with a CCAI above 870 infringes; witness evading the
answer by stating that CCAI calculations are appropriate when
correct samples are not available for testing.").

[85]Magēmā's MNT, Docket Entry No. 292, p. 7.

[86]Id. at 20.

they actually are."[87]  As evidence that Defendants improperly
compared their refinery processes to the Rigby Process, Magēmā
cites the following excerpt from Defendants' opening statement:

> . . . This Rigby Process that Mr. Moore and Mr. Klussmann
> were pitching to Phillips 66 and a whole bunch of other
> people, that nobody ever wanted, was relying on what's
> called a residual hydrotreater or a resid hydrotreater.
> Well, Phillips knew about that.  They had one at one time
> out in West Texas, in Borger.  The resid hydrotreater
> operates at a much higher pressure and puts a lot more
> stress on the catalysts.  What Wood River and Bayway do,
> Wood River operates on a slurry hydrotreater, and Bayway
> is called a gas oil hydrotreater.  They operate very
> differently.[88]

Magēmā argues that Defendants supported their argument that the
Bayway refinery did not practice the Rigby process with testimony
from Dennis Vauk, Phillips 66's director of hydroprocessing
technology,[89] on the second day of trial; Greg Witte ("Witte"),
Phillips 66's process design engineer a the Wood River refinery,[90]
on the fourth day of trial; and Mike Matthews ("Matthews"), the
United States Gulf Coast fuel trader for Phillips 66,[91] on the fifth
day of trial.[92]  Magēmā also argues that Defendants reiterated this

---

[87]Id.

[88]Id. at 19 (quoting Trial Transcript Day 1, Docket Entry
No. 284, pp. 1-92:23-93:9).

[89]Trial Transcript Day 2, Docket Entry No. 285, p. 2-166:23-25.

[90]Trial Transcript Day 4, Docket Entry No. 287, p. 4-237:18-22.

[91]Trial Transcript Day 5, Docket Entry No. 288, p. 5-22:7-8.

[92]Magēmā's MNT, Docket Entry No. 292, p. 19 n. 8 (citing Trial
                                    (continued...)

improper argument during their closing statement.[93]  Asserting that
"the Rigby Process is just one embodiment of the broader asserted
claims," Magēmā argues that Defendants'

> misleading comparison created the inaccurate impression
> that the claims would not cover "different
> hydrotreaters," "different feeds," and "different start-
> up and operating plans." . . . This cannot be reconciled
> with the claim language as construed.  Moreover, this
> improper comparison conflated the jury's task to compare
> [Defendants'] accused products to the asserted claims
> with additional, confusing, and irrelevant comparisons to
> the Rigby Process.  Expecting the jury to keep these
> improper comparisons distinct from its infringement
> determination was unreasonable.  This placed an
> impossible task on the jury, and ultimately, constitutes
> a prejudicial error that warrants a new trial.[94]

Asserting that "Magēmā found none of this sufficiently
problematic in the real time to object back then," Defendants
respond that Magēmā has waived the alleged error related to
Defendants' reference to the Rigby Process at trial.[95]  Asserting
that Magēmā takes its transcript excerpts out of context,
Defendants also argue that "[t]his challenge fares no better on the
merits."[96]  The court agrees.

---

[92](...continued)
Transcript Day 2, Docket Entry No. 285, pp. 2-237:25-239:19; Trial
Transcript Day 4, Docket Entry No. 287, p. 4-255:21-25; and Trial
Transcript Day 5, Docket Entry No. 288, p. 5-29:14-19).

[93]Id. (citing Trial Transcript Day 6, Docket Entry No. 289,
p. 6-95:10-14).

[94]Id. at 20-21.  See also Magēmā's Reply, Docket Entry No. 294,
pp. 9-10.

[95]Defendants' Response to Magēmā's MNT, Docket Entry No. 293,
p. 15.

[96]Id.

The closing argument made by defense counsel about which Magēmā complains was made without objection from Magēmā. Objections to improper closing arguments not made contemporaneously are waived, and Magēmā is, therefore, "barred 'from urging the improper arguments as grounds for a new trial after the jury . . . returned its verdict.'" Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc., 848 F.2d 613, 619 (5th Cir. 1988) (citations omitted). Moreover, as Defendants point out,

> [i]n each of Magēmā's citations, when [Defendants'] counsel referred to the Rigby Process or to the 'type of hydrotreater they were proposing to use,' it was expressly to explain what Mr. Moore and Mr. Klussmann pitched to Phillips 66 at the 2017 meetings. . . [I]t was Magēmā who hammered on the theme that the information Mr. Moore and Mr. Klussmann shared in those meetings was so valuable to Phillips 66 that it took the Rigby Process for itself and cut Magēmā out.  Nothing about the Court's claim construction or the case law hamstrung [Defendants] from countering that evidence by explaining why Mr. Moore's and Mr. Klussmann's business pitch of the Rigby Process at those meetings was incompatible with Phillips 66's refinery technology and therefore worthless to it.[97]

In its opening statement Magēmā told the jury that Defendants "infringed their technology — in other words, they took what didn't belong to them by using our technology without paying for it — and they disregarded the inventors' hard work, believing they could do that because they wouldn't be held accountable.  That's the wrong way of doing things."[98]  Magēmā told the jury that it has "a sister

---

[97]Id. at 15-16 & nn. 17-18.

[98]Trial Transcript Day 1, Docket Entry No. 284, p. 67:2-6.

company called Rigby whose job is to commercialize Magēmā's technology[, and that t]he meetings between Phillips and . . . Rigby tell the story of willfulness."[99]   Magēmā cited these meetings, and presented testimony about the information shared during them, as evidence that Defendants incurred liability by using information gained at those meetings without paying for it. Defendants' opening and closing statements, and the trial testimony referencing the Rigby Process about which Magēmā complains were not, as Magēmā argues, an improper comparison of Defendants' processes to a single commercial embodiment of the patented invention,[100] but instead, explanations for why Phillips chose not to pursue Rigby's business proposals, _i.e._, evidence offered to counter Magēmā's contention that any infringement of its patents was willful.

Patent infringement is decided by comparing the accused technology to the patent claims.  As evidenced by the discussion above in § III.C.1-3, whether the accused products satisfied the patents' claims was vigorously disputed at trial.  Moreover, Magēmā acknowledges that its "closing and the Court's jury charge properly identified the focus as a comparison between the claim language as construed and the accused products."[101]   Because Magēmā did not

---

[99]_Id._ at 77:12-15.

[100]Magēmā's MNT, Docket Entry No. 292, pp. 7, 19-21.

[101]See Magēmā's MNT, Docket Entry No. 292, p. 6.

raise the meetings between representatives of Phillips 66 and Rigby as evidence of infringement, but instead, as evidence that any infringement of its patents was willful, the court is not persuaded that Defendants compared their "accused processes to the single, narrower commercial embodiment of the Rigby Process," that any such comparison "misled the jury into believing that the claims were narrower in scope than they actually are,"[102] or that "[e]xpecting the jury to keep these . . . comparisons distinct from its infringement determination was unreasonable[, [or p]laced an impossible task on the jury."[103]  Accordingly, the court concludes that Defendants did not introduce legal error by comparing its refinery processes to the Rigby Process.

## E.   Defendants Did Not Use Improper Trial Tactics

Asserting that Defendants' "improper trial tactics were not limited to conduct specifically identified in the preceding sections,"[104] Magēmā argues that Defendants' "improper trial tactics permeated all aspects of the trial, rendering the entire trial unfair."[105]  Citing <u>Alaniz v. ZamoraQuezada</u>, 591 F.3d 761, 778 (5th Cir. 2009), for holding that when asked to determine if manifest

---

[102]<u>Id.</u> at 20.

[103]<u>Id.</u> at 21.

[104]<u>Id.</u>

[105]<u>Id.</u>

injustice warranting a new trial has occurred, courts in this circuit consider "the comments of counsel, the counsel's trial tactics as a whole, the evidence presented, and the ultimate verdict,"[106] Magēmā argues that Defendants' improper trial tactics included (1) misleading the jury with legally erroneous argument that Defendants were free to use the patented technology because there was no non-disclosure agreement ("NDA") in place; (2) implying that Phillips invented the patented technology first; (3) presenting unlabeled and misleading samples to the jury; and (4) making factually incorrect and prejudicial statements during closing argument.[107]

### 1.   Defendants' References to a NDA Were Not Improper

Citing the following statement from Defendants' closing argument, Magēmā argues that Defendants improperly mislead the jury by erroneously arguing that they were free to use the patented technology because there was no non-disclosure agreement in place:

> There's something interesting that Magēmā never told you, and anybody involved in the patent process knows this. And that is that you can take anything, any information you want from a meeting, as long as there's no nondisclosure agreement — and that's undisputed there was none.[108]

---

[106] Id.

[107] Id. at 21-26.

[108] Id. at 21-22 (citing Trial Transcript Day 6, Docket Entry
(continued...)

Asserting that "there is no obligation to keep a patented (or patent-pending) technology secret using [NDAs] in order to preserve a claim of patent infringement if the disclosed technology is later used without authorization,"[109] Magēmā argues that Defendants' mention of NDAs in closing "misled the jury as to the law.  And, given that NDAs were not at issue, the jury charge did not include any instruction related to NDAs to cure [Defendants'] blatant misstatement."[110]

The closing argument made by defense counsel about which Magēmā complains was made without objection at trial.  Objections to improper closing arguments not made contemporaneously are waived, and Magēmā is, therefore, "barred from urging the improper arguments as grounds for a new trial after the jury . . . returned its verdict."  Nissho-Iwai Co., 848 F.2d at 619.  Even if Magēmā had objected the challenged statement would not warrant any relief.  The absence of an NDA between Defendants and Rigby was introduced by Magēmā during direct examination of Moore regarding an April 2017 meeting.[111]  Missing from Magēmā's briefing is a cite to any testimony or argument that a party is free to infringe a patent unless an NDA is in place.  As Defendants point out,

---

[108](...continued)
No. 289, p. 6-95:15-21 (emphasis in original)).

[109]Id. at 22.

[110]Id.

[111]Trial Transcript Day 2, Docket Entry No. 285, pp. 2-44:5-48:3.

the topic of the NDA only came up because it was Magēmā
who repeatedly muddled the issues by arguing that
[Defendants] bore liability or guilt by virtue of
allegedly getting and using information from the meetings
with Magēmā. . .

Such evidence has no relevance, of course, to patent
infringement, which is decided solely by comparing the
accused technology to the patent claims, irrespective of
whether the parties had ever met at all.  Patents, of
course, are public.  But Magēmā nevertheless raised those
meetings and what was shared in them specifically to
suggest, wrongly, that [Defendants] bore liability
because it allegedly used the information shared in those
meetings.  In response [Defendants] rightly reminded the
jury that this is not a trade secrets case, and that
[Defendants were] free to use the information shared in
those meetings — which not itself patented, and in fact
no patents even existed at the time of any meetings —
because the information was not protected by an NDA.[112]

Accordingly, the court concludes that Defendants's references to a

NDA during closing argument were not improper.


2.    Defendants Did Not Improperly Argue that Magēmā's
      Technology was Not Patentable or Improperly Imply that
      Defendants Invented the Patented Technology First

Citing the following testimony from Dennis Vauk, Phillips 66's

director of hydroprocessing technology,[113] Magēmā argues that

Defendants improperly argued that its technology was not patentable

and improperly implied that Phillips invented the patented

technology first:

---

[112]Defendants' Response to Magēmā's MNT, Docket Entry No. 293,
p. 17 & nn. 22 and 23 (citing Trial Transcript Day 1, Docket Entry
No. 284, pp. 1-78:11-83:4 (opening argument); and Trial Transcript
Day 6, Docket Entry No. 289, pp. 6-81:11-84:8 (closing argument)).

[113]Trial Transcript Day 2, Docket Entry No. 285, p. 2-166:23-
25.

> Q.   As part of the projects at Bayway or Wood River,
>      did you or anyone else at Phillips 66 pursue any
>      patents?
>
> A.   No, we didn't pursue any patents because these were
>      technologies that had been practiced for many years
>      at the refinery, and there was nothing patentable
>      about the solution that we came up with.[114]

Citing the following statement of defense counsel during closing argument, Magēmā argues that Defendants sought to undermine the patents' novelty by arguing that Phillips was the first to come up with the solutions that were implemented at the Bayway (and Wood River) refineries: "Mr. Witte came up with this idea . . . That idea was not only in Mr. Witte's head, but he wrote it down well before there was any discussion at all with these Rigby personnel . . . Mr. Vauk . . . came up with the idea . . ."[115]

Defendants respond that they never contended that Magēmā's technology was unpatentable or that Phillips 66 invented Magēmā's technology, and that Vauk expressly testified to the contrary, i.e., Vauk testified that he did not dispute that Magēmā's patents were valid but that he did dispute that Phillips 66 was using Magēmā's patented technology.[116]  Thus, the evidence at trial does not support Magēmā's contention that Defendants improperly argued the patents were not patentable.

---

[114]Magēmā's MNT, Docket Entry No. 292, pp. 22-23 (citing Trial Transcript Day 2, Docket Entry No. 285, p. 2-245:15-20).

[115]Id. at 23 (citing Trial Transcript Day 6, Docket Entry No. 289, pp. 6-87:22-88:25).

[116]Defendants' Response to Magēmā's MNT, Docket Entry No. 293, p. 18 (citing Trial Transcript Day 3, Docket Entry No. 286, pp. 3-44:21-45:7).

As evidence that Defendants were not using Magēmā's technology, Defendants presented testimony of Vauk and Witte, that they each came up with their own solutions to the IMO 2020 problem, that their solutions not only differed from Magēmā's solution but also predated Defendants' meetings with Rigby.[117]   At closing argument defense counsel summarized Vauk's and Witte's testimony by telling the jury that

> When we started this case, Magēmā told you how they intended to try their case.  What they intended to say was that [Defendants] did things the wrong way; and they did it the right way; and that [Defendants] had taken what was theirs, they had stolen it.  The suspicions, not the documented facts.
>
> Because we know what those documented facts are. Greg Witte and Dennis Vauk each have worked with hydrotreaters for over 40 years.  Mr. Witte testified right up there, and you've see — you will see his documents, Defendants' 201 and 200. . .
>
> In November of 2016, Mr. Witte came up with the idea of using slurry at the Wood River hydrotreater to meet IMO 2020, and he recorded that in those two documents.
>
> Mr. Vauk testified about coming up with the idea of using light cycle gas oil as part of the stream at the Bayway Refinery to meet the IMO 2020 requirements, and he recorded that in Defendants' Exhibit 83, his March 2017 memorandum.  All of that occurred before Rigby and Magēmā ever entered the door at Phillips 66.

---

[117]See Trial Transcript Day 2, Docket Entry No. 285, pp. 2-176:7-177:9 and 2-223:23-224:15 (Vauk testimony) and March 8, 2017, email, Defendants' Trial Exhibit 83, Docket Entry No. 267-15 (supporting Vauk testimony); Trial Transcript Day 4, Docket Entry No. 287, pp. 4-242:10-247:23, and November 2016 emails and May 2015 white paper, Defendants' Trial Exhibits 200 and 201, Docket Entry Nos. 268-7 and 268-8, respectively (supporting Witte testimony).

Essentially what Magēmā is telling you folks in this case is that every witness that you have heard from Phillips 66 who told you about how this happened, how nothing at these meetings . . . influenced them in any way, that they're all not telling the truth, they're lying to you.[118]

Because Defendants presented evidence at trial that Vauk and Witte each came up with their own solution to the IMO 2020 problem before Defendants had any meetings with Rigby, and that their solutions differed from Magēmā's solutions, the evidence at trial does not support Magēmā's contention that Defendants improperly implied that Defendants invented the patented technology first.  To the contrary, this evidence was relevant to Defendants' defense to Magēmā's allegations of willfulness, i.e., that Defendants solved the IMO 2020 problem using their own technology.

### 3. Defendants' Use of Sample Demonstratives Was Neither Improper nor Prejudicial

Asserting that the samples Defendants "brought to trial were improper and misleading, collected at an unknown time, from [an] unknown location, and from an unknown mode of operation that was never confirmed,"[119] Magēmā argues that it was highly prejudicial for Defendants to use the samples at trial.[120]

_____

[118]Trial Transcript Day 6, Docket Entry No. 289, pp. 6-94:6-95:5.

[119]Magēmā's MNT, Docket Entry No. 292, pp. 23-24.

[120]Id.

-43-

Defendants respond that there was nothing improper about their use of sample demonstratives, which Magēmā subjected to cross-examination.   Defendants explain that

> Vauk testified about two glass vials to illustrate the residue and gas oil at the Bayway facility.  He used them to explain the process by which residue and gas oil are blended together to create marine fuels.  The samples were demonstratives, not admitted into evidence, and Magēmā raised no objection to their use or to Mr. Vauk's testimony about their provenance.
>
> Indeed, Magēmā did precisely what the adversarial system envisions: used cross-examination to impugn the reliability of Mr. Vauk's testimony about the samples, by challenging his knowledge about the samples' dates and collection processes.  Indeed, Magēmā showed the jury its own competing demonstrative, of a different glass vial that Magēmā compared to [Defendants'] demonstratives. . . [T]hese exchanges, remarkable only insofar as they illustrate how cross-examination is supposed to work, give rise to no error at all, let alone manifest injustice.[121]

Magēmā argues that Defendants use of the demonstratives was highly prejudicial, but Magēmā failed to object to Vauk's testimony about them at trial.   Moreover, Magēmā fails to explain in its briefing how Vauk's testimony about the demonstratives prejudice it, or why any prejudice was not dispelled by cross-examination of Vauk.   Accordingly, the court concludes that Defendants' use of sample demonstratives was neither improper nor prejudicial.

---

[121]Defendants' Response to Magēmā's MNT, Docket Entry No. 293, p. 19 (citing Trial Transcript Day 2, Docket Entry No. 285, pp. 2-218:22-219:24; Trial Transcript Day 3, Docket Entry No. 286, pp. 3-26:15-27:20).

4.   <u>Defendants' Closing Arguments Were Not Improper</u>

Citing the following statement from Defendants' closing argument, Magēmā argues that Defendants' counsel made factually incorrect and prejudicial closing arguments to the jury:

> But folks, there's no way I can put it any plainer than this.  This wrong place to sample is wrong because if it were true and <u>gases were coming out at the surge drum, all hell would have broken loose at the refinery</u>. Alarm bells would have gone on.  Because what's one of the most dangerous conditions in a refinery?  Escaping gas.  <u>And that has never happened.</u>[122]

Asserting that "[t]here is absolutely no support for this argument,"[123] Magēmā argues that this statement contradicts both the testimony of Allen, Bayway's former technical manager and current maintenance manager, and Defendants' own documents.[124]   Magēmā argues that

> [t]his is not the only example of unsupported statements in [Defendants'] closing arguments. [Defendants'] counsel also argued about designing around the patented technology — 'It's just not that hard.' . . . Yet the quote he references was never discussed by any witness at trial nor did any technical witness offer any opinion that it would or would not be difficult to design around the patents.   These significant and prejudicial statements in [Defendants'] closing arguments — in addition to others discussed in preceding sections — lacked evidentiary basis.[125]

---

[122]Magēmā's MNT, Docket Entry No. 292, pp. 24-25 (citing Trial Transcript Day 6, Docket Entry No. 289, p. 6-104:3-9 (emphasis in original)).

[123]<u>Id.</u> at 25.

[124]<u>Id.</u> (citing Trial Transcript Day 6, pp. 6-28:8-10 and 6-38:14-39:13, and Plaintiff's Trial Exhibit 658, Docket Entry No. 279-35).

[125]<u>Id.</u> at 26.

Citing <u>Nissho-Iwai Co.</u>, 848 F.2d at 619, Defendants respond that "Magēmā's 'failure to object contemporaneously during [Defendants'] closing argument' means it has 'waived this point' as a basis for a Rule 59 motion for a new trial."[126]   Defendants also argue that despite Magēmā's contention to contrary, there was nothing improper about their closing arguments because the challenged statements are supported by the record.[127]

The closing arguments made by defense counsel about which Magēmā complains were made without objection at trial.  Objections to improper closing arguments not made contemporaneously are waived, and Magēmā is, therefore, "barred from urging the improper arguments as grounds for a new trial after the jury . . . returned its verdict."  <u>Nissho-Iwai Co.</u>, 848 F.2d at 619.  In the event of waiver, a court may grant a new trial only if the closing argument "affect[s] the substantial rights of the parties'" by, for example, "seriously prejudic[ing the movant's] right to a fair trial." <u>Edwards v. Sears, Roebuck and Co.</u>, 512 F.2d 276, 286 (5th Cir. 1975) (quoting Fed. R. Civ. P. 61).  <u>See also</u> <u>Baisden v. I'm Ready Productions, Inc.</u>, 693 F.3d 491, 509 n. 17 (5th Cir. 2012), <u>cert. denied</u>, 133 S. Ct. 1585 (2013) (movant who failed to object to closing argument at trial must show "the statements rise to the level of severity that would require a new trial to avoid a miscarriage of justice").  Magēmā neither argues nor makes any

---

[126]Defendants' Response to Magēmā's MNT, Docket Entry No. 293, p. 20.

[127]<u>Id.</u> at 20-21.

showing that the closing statements about which is complains require a new trial to avoid a miscarriage of justice. Even if Magēmā had objected to the challenged statements at trial, those statements would not warrant relief because they are supported by the record, and because Magēmā fails to explain how it was prejudiced by them.

Magēmā argues that defense counsel's statement that "if . . . gases were coming out at the surge drum, all hell would have broken loose at the refinery," is not supported by the record, because Allen testified that "if there was <u>gasoline-type</u> molecules going down there with <u>high flows</u> or <u>high amounts</u>, it would overwhelm the system,"[128] but "did <u>not</u> testify that if any gases were coming out at the surge drum 'all hell would have broken loose.'"[129] Magēmā argues that Dr. Loezos, Magēmā's expert on hydroprocessing and analysis of operational data and physical properties,[130] was clear that "removing small amounts [of gas] . . . has a dramatic impact on flash;"[131] a point with which Allen appears to agree.[132] While

---

[128]Magēmā's MNT, Docket Entry No. 292, p. 25 (citing Trial Transcript Day 6, Docket Entry No. 289, p. 6-39:7-13 (emphasis in original)).

[129]<u>Id.</u>

[130]Trial Transcript Day 3, Docket Entry No. 286, p. 3-170:9-12 (identifying Dr. Loezos as an expert).

[131]Magēmā's MNT, Docket Entry No. 292, p. 25 (citing Trial Transcript Day 3, Docket Entry No. 286, pp. 3-188:24-25 and 3-206:9-10).

[132]<u>Id.</u> (citing Trial Transcript Day 6, Docket Entry No. 289,
(continued...)

defense counsel's statement that "all hell would have broken loose," may have been hyperbolic, because the parties vigorously contested — and presented conflicting evidence — on the impact that Drum D-101 had on gases that effect flash point of the material hydroprocessed at the Bayway refinery, the court is not persuaded that the challenged statement is not supported by the record.

Magēmā argues that defense counsel's argument "about designing around the patented technology — 'It's just not that hard.' . . . was never discussed by any witness at trial," but the Due Diligence Report that Freepoint Commodities prepared for Magēmā and Rigby, which was Defense Exhibit 349, states in pertinent part that "[t]he Rigby Process can be circumvented using conventional desulfurization designs.   Similar ISO-compliant desulfurization processes may also be built without infringing on the Rigby Process IP by . . . designing around the Rigby Process IP."[133]   This report was admitted into evidence during direct examination of Tom Britven, Defendants' damages expert.[134]   Because defense counsel's closing statement is taken almost verbatim from the Freepoint Commodities Due Diligence Report, the court is not persuaded that this statement was not supported by the record.

---

[132](...continued)
p. 6-25:22-23).

[133]Freepoint Commodities, LLC: Rigby Refining Project Technical Due Diligence Report, p. 4, Defendants' Trial Exhibit 349, Docket Entry No. 271-7, p. 5.

[134]Trial Transcript Day 5, Docket Entry No. 288, p. 5-207:10-21.

Magēmā argues that defense counsel made statements during closing arguments that were unsupported by the record, but the court's review of the challenged statements and the underlying evidence leads it to conclude that the statements were not unsupported by the record.  Moreover, because Magēmā failed to object to the statements at trial, and failed to explain in its briefing how these statements prejudice it, the court concludes that the challenged statements were neither improper nor prejudicial.

**F.   The Jury's Verdict Is Not Against the Great Weight of the Evidence**

Asserting that the jury's verdict that Defendants' Bayway refinery did not infringe Claims 1 and 5 of the '884 Patent is against the great weight of the evidence, Magēmā argues that a new trial is warranted to prevent a miscarriage of justice.[135] Summarizing evidence that it contends establish that Defendants' Bayway refinery infringed Claims 1 and 5 of the '884 Patent, and citing Edwards, 512 F.2d at 276, and Whitehead v. Food Max of Mississippi, Inc., 163 F.3d 265 (5th Cir. 1998),  Magēmā argues that Defendants'

> trial strategy was to distract the jury from the actual issues that they were tasked to decide.  The cumulative violations of the Court's claim construction order, [Defendants'] reference to excluded evidence,

---

[135]Magēmā's MNT, Docket Entry No. 292, pp. 26-29.

[Defendants'] fabrication of requirements not present in the claims or constructions, and other improper arguments warrant a new trial to allow justice to be served.[136]

Defendants respond that Magēmā is not entitled to a new trial based on the weight of the evidence for claims on which it bore the burden of proof because "there is always a 'reasonable basis' for a verdict against the party with the burden of proof."[137]  Asserting that "Magēmā raises two complaints: that the jury rejected Magēmā's argument that the Accused Products were merchantable, and that the jury rejected Magēmā's argument that the hydroprocessor is delineated by the reactor rather than the battery limits,"[138] Defendants argue that both these issues were "hotly contested issues on which [they] presented ample competing evidence.  The jury had every right to determine that Magēmā, as the party with the burden of proof on both these issues, failed to carry that burden."[139]  The court agrees.

Magēmā did not move for judgment as a matter of law at the close of its evidence, and was content to submit the case to the jury.  The jury returned a unanimous verdict.  Despite the court's conclusion in § III.B.3, above, that Defendants improperly argued that actual test data was required to prove infringement, and that

---

[136]Id. at 29.

[137]Defendants' Response to Magēmā's MNT, Docket Entry No. 293, p. 22.

[138]Id.

[139]Id.

Magēmā was thereby, prejudiced, the court has already explained its reasons for concluding that that prejudice is not sufficient to warrant a new trial.  Moreover, Magēmā's reliance on <u>Edwards</u> and <u>Whitehead</u> in support of its MNT is misplaced.

<u>Whitehead</u> was a civil suit against a retailer resulting from the kidnapping at knife-point of a mother and daughter from the store's parking lot during which the mother was sexually assaulted.  163 F.3d at 268.  The Fifth Circuit remanded the case for a new trial after finding that counsel for the plaintiff engaged in a litany of improper arguments that the Fifth Circuit found highly prejudicial to the defendants.  <u>Id.</u> at 276.  <u>Edwards</u> was a civil suit against a retailer for wrongful death in an automobile collision allegedly caused by faulty tires purchased from the defendant.  In <u>Edwards</u> the Fifth Circuit held that a new trial was necessary "to avoid a miscarriage of justice," 512 F.3d at 286, based on closing arguments by plaintiff's counsel, even though defense counsel failed to object at trial.  There, counsel

> discussed with the jury the value which his own son would place on his father's life, played on counsel's personal association with the deceased, evoked the image of [the] deceased's children crying at [the] graveside and forlornly awaiting the return of their father, and urged upon the jury the need for retributive payments from defendants.

<u>Id.</u> at 285.  The conduct of defense counsel about which Magēmā complains is nothing comparable to the conduct that lead the Fifth Circuit to grant new trials in either <u>Whitehead</u> or <u>Edwards</u>.

Because the parties presented conflicting evidence on the disputed issues from which the jury could reasonably have concluded that Magēmā did not prove its claims by a preponderance of the evidence, the court will not disturb the jury's verdict by ordering a new trial.  After considering the record as a whole, the court is not persuaded that manifest injustice will result from letting the verdict stand.

## IV.  **Conclusisons and Order**

For the reasons stated above in § III, Magēmā's Rule 59 Motion for New Triall, Docket Entry No. 292, is **DENIED**.[140]

**SIGNED** at Houston, Texas, on this 30th day of November, 2023.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

---

[140]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions.  As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments.  While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion.  Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments that they have previously raised or that they could have raised.